**IRVING TRUST CO. v. CHASE NAT. BANK OF CITY OF NEW YORK et al.**

**In re ROBBINS & PROKESCH, Inc.**

**No. 220.**

Circuit Court of Appeals, Second Circuit.

Aug. 17, 1934.

Krause, Hirsch & Levin, of New York City (Sydney Krause and George C. Levin, both of New York City, of counsel), for appellant.

Rushmore, Bisbee & Stern, of New York City (George L. Trumbull and Stuart H. Steinbrink, both of New York City, of counsel), for appellee Chase Nat. Bank of City of New York.

Blumberg & Parker, of New York City (Samuel M. Chapin and Monroe Chapin, both of New York City, of counsel), for appellee Bank of Manhattan Trust Co.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a suit by the trustee in bankruptcy of Robbins & Prokesch, Inc., against the Chase Bank and Bank of Manhattan Trust Company to recover payments made by Robbins & Prokesch, Inc., in contravention of section 15 of the Stock Corporation Law of the state of New York (Consol. Laws, c. 59).

It is necessary for the claimant to establish that:

(1) The insolvency of Robbins & Prokesch, Inc., existed or was imminent at the times when it made the payments.

(2) The payments resulted in a preference.

(3) The banks, at the time when the payments were received, had notice or reasonable cause to believe that they would effect a preference.

(4) An intent to give a preference existed on the part of the bankrupt.

Robbins & Prokesch, Inc., a New York corporation, was a manufacturer of ladies' handbags. Its principals had been in business for many years and were well regarded in the trade. It suffered an operating loss of $100,418.42 in 1930, and its net worth declined from $115,618.88 on December 31, 1930, to $9,070.20 on December 31, 1931. This loss was due both to the depression and the interruption of business and disturbance of the corporate organization in moving the factory from New York to Sussex, N. J.

The principal stockholders and officers were Bernard and Benjamin Robbins. During the second half of 1931, Benjamin wished to relinquish his interest in the business. It was recognized that it would be difficult for Bernard to continue the business, as he wished to do, unless creditors were willing to give extensions of the corporate obligations. Ac-

cordingly Bernard Robbins arranged with the merchandise creditors to pay 50 per cent. on the claims within 60 days, 25 per cent. within the next 60 days, and the remaining 25 per cent. within a year. He had informed his banks of the proposal to the merchandise creditors, and, while he did not ask them to enter into the same arrangement, he suggested that the line of credit which he had with them should be extended for 120 days and told his merchandise creditors that the banks would "play along." Though the banks gave him some encouragement at first, they told him that they expected payment of all their notes as they matured and in practice only varied a little from this exacting requirement by renewing to a limited extent.

Robbins & Prokesch, Inc., owed the Chase Bank $17,500, for which it had given notes, two for $2,500 and $3,500, respectively, falling due in December, one for $4,000 on January 8, 1932, one for $4,000 on January 15, and one for $3,500 on January 25 of that year. It owed Bank of Manhattan $15,000 on three notes—$5,000 due December 21, $5,000 due December 24, and $5,000 due December 31, 1931. It also owed the Sussex National Bank of New Jersey $10,000 on two notes of $5,000 each due in February, 1932. By January 25, the Chase Bank had received all but $2,750 of the $17,500 which was due it in the beginning. The Manhattan Bank received all but $5,000 of the $15,000 due in December. The balance was paid $1,750 in January, $1,500 in February, $1,250 in March, and the $500 remaining on April 5, 1932.

All the merchandise creditors signed the extension agreement and received 50 per cent. of their claims. Robbins did not wait until the 60 days, but began to pay about December 27, and completed the 50 per cent. installment in February. He was unable to pay the next 25 per cent. installment, though, before it came due, the banks were paid in full. Bernard Robbins continued the business from December 19, 1931, to May 31, 1932, and incurred debts of $32,600 for new merchandise purchased largely from his old creditors. During that period the company paid about $27,000 of the $54,000 debts which were due the old merchandise creditors and about $3,000 out of some $16,000 owing on family claims which, it is said, were to be reduced on the same basis as the original merchandise creditors. It paid all but about $6,000 of the $32,600 of indebtedness to the new merchandise creditors and paid the banks in full. When some of the old merchandise creditors failed to receive the second installment on their claims and learned that Robbins & Prokesch, Inc., had assigned its accounts on February 18, 1932, to raise money and that the banks had fared better than themselves, they filed a petition in bankruptcy, and after an adjudication the trustee brought this suit.

The case is undoubtedly a close one, and its decision depends on the resolution of questions of fact. The court below found that there was no intent on the part of Robbins & Prokesch, Inc., to give a preference to the banks. If this was wrong, it must be because Bernard Robbins, with his brother Benjamin, had guaranteed the notes of Robbins & Prokesch, Inc., held by the banks, and that one of Bernard's objects in having his corporation make the payments was to get rid of the personal liability of himself and his brother. While the conclusion of the trial judge that the discharge of this liability was of no moment to Bernard seems unlikely, we cannot say that he was wrong in finding that the dominating and only important thing in Bernard's mind was to keep the business afloat for himself and his son by paying off creditors that would not agree to extend the notes which they held. If the intent was to prefer, it seems difficult to suppose that Bernard would agree to purchase Benjamin's stock, have the corporation actively engage in manufacturing for some months before bankruptcy, and pay part of the notes as they matured, rather than the whole, when it was entirely possible to have completely discharged them earlier than he did. Moreover, when he was told by the Chase Bank that it would not extend payment of its notes as the merchandise creditors had their claims, he would not have got angry and said that its insistence on payment of the notes as they accrued had "dumped his whole plan of liquidation and literally made a liar of him to his creditors." Likewise the purchase of a large amount of stock by the corporation and the payment of nearly all the indebtedness thus incurred is further evidence that Bernard had faith in his ability to carry it through its embarrassment. It must be remembered that the statement of December, 1931, showed a net balance of assets, that he believed the accounts receivable good, the inventory valued too low, and the plant worth more than it was carried at. To suppose that he went to the labor of buying out his brother, purchasing new goods, personally going on the road to sell them, getting extensions from all his merchandise creditors, and continuing business for nearly six months, if his real purpose was to get his obligation to the banks discharged, is unlikely. It would have been much easier

to liquidate the corporation as rapidly as possible and in so doing run a fair chance of paying every creditor in full, instead of incurring the risk of going on and becoming subject to new indebtedness. The result would at worst have been only a small deficit to be met by his brother and himself.

It is said that the failure to inform the merchandise creditors that the banks would not "play along" indicates an intent to prefer, but it is equally consistent with a purpose to avoid any disturbance that might interfere with the success of the plan to continue the business.

It is also argued that there was a building up of accounts in the banks so as to safeguard them at all events and give them the privilege of a set-off. But there is no proof of any building up of accounts. The business seems to have gone on as it did before and the payments were all made by the checks of Robbins & Prokesch, Inc., on the banks. The latter took no set-offs, but only received the checks of their depositor.

We have some doubt whether the corporation was insolvent when the payments were made and whether the banks had reasonable cause to believe that a preference was intended. But, if both these factors existed, we still cannot see that an intent to prefer was present. Bernard Robbins denied it, and the trial judge believed him. We are not inclined to disturb the finding of an experienced trier of the facts. We are not satisfied that the banks ever made any agreement to extend their notes pari passu with the claims of the creditors, or even that the creditors had any belief that they had done this. Mr. Tompkins was assistant secretary of the Trade Association and had charge of gathering the consents of the merchandise creditors to the agreement of extension. He cannot be regarded as a person as available to testify for the defendants as for the complainant, so that we think the judge might draw the inference, because of the failure of the complainant to call him, that the creditors did not suppose that the banks were legally bound to such extension as the creditors had granted. There was certainly no satisfactory proof of any such agreement by the banks, and it seems unlikely that the creditors, and those advising them, would suppose that the banks had bound themselves to extend their paper in such precarious times, without better proof than the vague statement of Bernard Robbins that they would "play along." It must be remembered in this connection that he testified that some of the payments to the banks were definitely known and agreed to by the leading creditors and that the judge found him to be a truthful witness.

It is significant that, if the assets remaining at the time when the petition in bankruptcy was filed be valued at anything like their worth to a going concern, the deficit would be very small. This general consideration bears out Robbins' position that he had an honest belief that he could take over the business, continue it for himself and his son, and pay all the creditors in full. He was mistaken in a time of unprecedented financial stress, but because of this we should not impute to him an intention to prefer.

Decree affirmed.