## TODARELLI v. VISIGRAPH TYPEWRITER MFG. CO. et al.

### In re C. SPIRO MFG. CO.

District Court, S. D. New York.
May 20, 1940.

David Haar, of New York City, for plaintiff.

Cook, Nathan, Lehman & Greenman, of New York City (Harold Nathan and Chester Rohrlich, both of New York City, of counsel), for defendants.

COXE, District Judge.

This is a suit under Section 15 of the New York Stock Corporation Law, Consol. Laws, c. 59, to recover various alleged preferential payments made by the bankrupt to the defendant Visigraph Company over a period of upwards of twelve years prior to bankruptcy.

The bankrupt was a New York corporation engaged in the manufacture and sale of automobile specialities and other products. It owned a large manufacturing plant at Dobbs Ferry, N. Y., and was entirely a family concern in which members of the Spiro family were financially and actively interested. The directing head of the business was Walter J. Spiro, who had for many years been an officer of the company. The company filed a voluntary bankruptcy petition on August 24, 1937, and, after adjudication, the plaintiff was appointed trustee.

The defendant Visigraph Company was prior to 1920 a New York corporation. In that year it went through voluntary dissolution proceedings, and the defendant Lesinsky, who had previously been an officer of the company, was placed in charge of the liquidation of the assets. He has been joined as a defendant on allegations that the challenged payments to the Visigraph Company were received by him as liquidating trustee for the company.

The payments to the Visigraph Company have a long history. Prior to 1924 the company sued the bankrupt in the State court to recover a large sum, and, after a bitterly contested trial, the court on February 8, 1924, directed judgment against the bankrupt for $139,650 and interest. The parties then negotiated a settlement, and on April 3, 1924, an agreement was signed by which the indebtedness was reduced to $60,000, payable, $8,900 in cash, and the balance of $51,100 in yearly installments over a period of nine years.

The cash payment of $8,900 required by the settlement was made at once, and the installment of $6,000 maturing in 1925 was paid during that year. The bankrupt was not able, however, to meet the $6,000 installment falling due in 1926, and, after making an account payment of $500, requested a modification of the agreement. This resulted in a supplemental agreement, entered into on June 4, 1926, under which the remaining indebtedness was made payable in progressively larger installments during the succeeding years, the last installment of $7,700 being payable on April 30, 1933. Subsequently, and on May 21, 1931, the Visigraph Company granted further extensions of the time of payment of the last four installments aggregating $31,-100.

The total payments of principal on the indebtedness prior to 1933 amounted to $32,500, including the first payment of $8,900 made in 1924, leaving unpaid at that time $27,500 of principal. These payments were never made promptly, with the exception of the first payment of $8,900. In 1933 the bankrupt created an issue of interest bearing second mortgage bonds which it offered to all of its then existing larger creditors. These bonds were accepted by the Visigraph Company in payment of the unpaid balance of its claim against the bankrupt, amounting to $27,500 of principal, together with the accrued interest thereon. Various other larger creditors of the bankrupt did likewise. In 1934, interest on these bonds was paid to all bondholders, the Visigraph Company receiving $1,535.

In addition to the above, the Visigraph Company received from the bankrupt three small payments, as follows: August 17, 1933, $38.72; September 5, 1935, $100; October 29, 1936, $510.25. It is not clear from the evidence what the first two of these payments were for. Walter J. Spiro testified that the last item of $510.25 was an unpaid balance resulting from the acceptance of the bonds in 1933. The defendant Lesinsky said it was on an "open account" with the bankrupt.

In order to recover under Section 15, it is necessary to show: (1) That the bankrupt was insolvent, actual or imminent, in the sense of being unable to meet its obligations in due course when the transfer was made; (2) that the transfer was made "with the intent of giving a preference"; (3) that it resulted in a preference; and (4) that the Visigraph Company had notice or reasonable cause to be-

lieve that it would effect a preference. Hughes v. Lawyers Trust Co., 2 Cir., 108 F.2d 792; Upright v. Brown, 2 Cir., 98 F.2d 802; Irving Trust Co. v. Chase Nat. Bank, 2 Cir., 72 F.2d 668; Dalziel v. Rosenfeld, 265 N.Y. 76, 191 N.E. 841. The requirement regarding notice or reasonable cause to believe that the transfer would effect a preference was only added to the section in 1929, and is not retroactive. Dalziel v. Rosenfeld, supra. It is, therefore, unnecessary to show such notice or reasonable cause to believe with respect to the payments made prior to 1929.

The condition of the bankrupt at the end of each calendar year from 1924 through 1935 is shown by the various accountants' reports in evidence. These reports, with accompanying schedules, were prepared by an accountant designated by the Visigraph Company, as required by the settlement agreement of April 3, 1924. They were supplemented by reports made to the directors by Walter J. Spiro, the directing head of the business, at different times during the greater part of the period covered. In general, the reports indicate a comparatively large volume of business on a seemingly inadequate amount of working capital.

The 1924 balance sheet shows cash of $1,627.01, current assets of $54,007.16, equity in Dobbs Ferry realty of $28,280.77, and machinery and equipment of $60,343.46. The total assets appear at $122,902.67. On the liability side, the current liabilities are shown at $51,673.12, and the total liabilities at $113,875.52. In this latter figure is included as a deferred liability the indebtedness to the Visigraph Company to the extent of $45,100.

The balance sheet at the end of 1925 shows total assets at $137,037.45, and total liabilities at $144,461.47; but included in the liabilities are amounts owing to the Spiros of $33,631.72. The cash appears at $189.73, and the accounts payable to trade creditors $19,564.84.

The 1926 balance sheet reflects an appraisal of the Dobbs Ferry property by Fish & Marvin at $171,000. It also shows a new first mortgage on the plant of $50,000, replacing two existing mortgages aggregating $32,000. The cash appears at $581.82, the accounts payable to trade creditors at $18,787.35, and the indebtedness to the Spiros at $61,776.03. The total assets are shown at $160,717.45, and the total liabilities at $213,997.57.

The reports for 1927, 1928, 1929 and 1930 all show an excess of liabilities over assets, but in each report the discrepancy is substantially the same, or less than, the indebtedness to the Spiros. This indebtedness steadily grew from a figure of $66,303.97 (exclusive of a $15,000 mortgage held by Grace Spiro) appearing in the 1927 balance sheet, to $111,249.87 as shown in the balance sheet as of the end of 1930.

In 1931 the Spiros cancelled over $90,000 of the indebtedness to them, and the balance sheet at the end of that year shows a corresponding improvement in the condition of the company. Thus the total assets at the end of 1931 are given as $162,049.65, and the total liabilities as $151,072.09. The amount shown as owing to the Spiros is $29,143.64. The improvement disclosed in 1931 seems to have disappeared in 1932, for the balance sheet at the end of that year shows total liabilities of $161,208.16 as against total assets of $145,558.86. The discrepancy is again represented by an increase of $17,975.95 in the amount owing to the Spiros.

The 1933 balance sheet reflects the condition of the company after the issuance of the second mortgage bonds taken by the creditors. It also shows the cancellation of considerable additional indebtedness by the Spiros. The total assets appear at $145,736.76, and the total liabilities at $141,309.92.

In 1934, the Dobbs Ferry property was written up to $171,249.04 to conform to an appraisal made by Fish & Marvin in 1930, less accrued depreciation. The machinery and equipment were similarly written up to $102,914.54 to reflect an appraisal made in 1934 by Manufacturers Appraisal Company. With these changes, the balance sheet at the end of 1934 shows total assets of $324,093.08 and total liabilities of $156,351.84. The figures for 1935 indicate considerable weakening in the condition of the company, particularly in the cash position and in the inability to pay current interest on the mortgages and current taxes.

The schedules attached to the reports disclose the operating results of the business for each year from 1924 through 1935. In 1924 the loss was $16,540.29 on total sales of $140,457.17. During 1925, 1926, 1927 and 1928, the sales steadily mounted until they reached the peak figure of $233,298.69 in 1928. In that year there was an operating profit of $6,791.44. From then on there was a gradual decline in the sales,

the lowest point being reached in 1935 when the sales amounted only to $71,302.94. In none of the years during the twelve-year period was there an operating profit, with the exception of 1928.

There are no figures for 1936 and 1937, and the evidence relating to those years is quite meager. The company continued, however, to conduct the business until the very eve of bankruptcy, largely on the expectation of receiving a large order, which never materialized. In October, 1936, $6,-000 was borrowed against a chattel mortgage on the machinery and tools, and the payment of $510.25 made to the Visigraph Company on October 29, 1936, came from this loan. The balance of the $6,000 went into the business as additional working capital.

The plaintiff concedes that there can be no recovery for the initial payment of $8,-900 made to the Visigraph Company in 1924. With respect to most of the subsequent payments, it may be assumed that the bankrupt was insolvent in the equity sense at all times since 1925, that a preference resulted as to each of such payments, and that the Visigraph Company had full knowledge of the financial condition at the respective times the payments were made.

■ The question still remains, however, whether the payments were made "with the intent of giving a preference". This language of the section has been the subject of considerable judicial interpretation. Cardozo v. Brooklyn Trust Co., 2 Cir., 228 F. 333; Matters v. Manufacturers' Trust Co., 2 Cir., 54 F.2d 1010; Upright v. Brown, 2 Cir., 98 F.2d 802; Dalziel v. Rosenfeld, 265 N.Y. 76, 191 N.E. 841. The test applied by Judge Veeder in the Cardozo case, supra, 228 F. page 334, was "whether the payment was made in contemplation of insolvency and winding-up as an impending fact, or in contemplation of continuing business in good faith". This was paraphrased by Judge Learned Hand in the Matters case, supra, 54 F.2d page 1014, where he said that the debtor "must actually believe that the gods will smile; it is not enough that their faces are inscrutable". By applying the test of these cases to the facts in the present case, I think it is clear that preferences were not intended.

■ With respect to the payments made before 1933, it is evident that the bankrupt had every intention to continue in business. The reports to the directors and the testimony of Walter J. Spiro exhibit at least this subjective belief. There was no thought of failure, and the Spiros were willing to back their faith in the enterprise by lavish expenditures of time and money. Moreover, the events up to 1933 showed that the belief was justified. It was a belief that the "gods will smile". The sales steadily mounted up to 1929; then they proceeded downward, but the prospects still remained brighter than for many other concerns caught in the depression. The company actually continued in business for four years after 1933, which is evidence that the belief was reasonable. Upright v. Brown, supra.

■ The transfers made in 1933 and thereafter present a somewhat different situation. The bonds issued in 1933 were accepted by substantially all of the larger creditors in payment of their respective claims. Interest on these bonds was paid during the first year to all bondholders, the Visigraph Company receiving two payments aggregating $1,535. I do not think that these payments were in any sense preferential.

■ There remain only the three small payments of $38.72 in August, 1933, of $100 in September, 1935, and of $510.25 in October, 1936. The first two of these were not explained at the trial, and may well be treated as having been made in ordinary course without any intent to prefer. The third payment of $510.25 was made from the $6,000 obtained on the chattel mortgage covering the tools and machinery. This was at a time when there was still a belief that the company would be able to survive. The company did not actually go into bankruptcy until ten months later, and although the payment is not entirely free from doubt, I do not think it can be said that an intent to prefer has been satisfactorily proved.

There may be a decree for the defendants dismissing the complaint with costs.