Max Bernstein and Esther Bernstein v. Commissioner.
Bernstein v. Commissioner
Docket No. 74938.
United States Tax Court
T.C. Memo 1960-287; 1960 Tax Ct. Memo LEXIS 10; 19 T.C.M. (CCH) 1569; T.C.M. (RIA) 60287; December 30, 1960
*10 Amount paid by corporation of which petitioner was sole stockholder in settlement of notes on which petitioner was guarantor constituted a dividend to petitioner. Petitioner has failed to establish that the amount of the payment in 1954 on corporate notes guaranteed by him was an allowable deduction. Louis A. Reiss, Esq., and Harry Merdinger, C.P.A., 61 Broadway, New York, N.Y., for the petitioners. Norman L. Rapkin Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion *11 SCOTT, Judge: The respondent determined a deficiency in income tax against the petitioners for 1954 in the amount of $5,327.48. The issues for decision are whether petitioner, Max Bernstein, received from his solely owned corporation a dividend either formally declared or constructive and, if so, whether he is entitled to a deduction under section 165 of the Internal Revenue Code of 1954, of $16,911.47 for a payment in discharge of his liability as endorser of certain corporate notes. Findings of Fact Some of the facts were stipulated and are found accordingly. Petitioners, Max Bernstein and Esther Bernstein, filed a joint Federal income tax return for the calendar year 1954 with the district director of internal *12 revenue for the thirteenth district of New York Max Bernstein (hereinafter referred to as petitioner) first became engaged in the meat business in 1923 when he opened a retail meat store. In 1942 or 1943 he began a business of slaughtering live cattle. He was also thereafter a stockholder at various times in several corporations engaged in the business of slaughtering cattle. In August 1950, petitioner, with two others, organized and became a 50 per cent stockholder in Wabash Packing Corporation (hereinafter referred to as Wabash), a corporation incorporated under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey. Wabash was engaged in slaughtering live cattle for the production and sale of meat and meat products. In July 1951 petitioner purchased the stock of the other two organizers of Wabash and became the sole stockholder. He has remained the sole stockholder throughout all periods pertinent hereto. Petitioner was the president of Wabash from the time of its organization, and from July 1951 through the year 1954 his sons, Philip, Erwin, and Sam Bernstein, were its secretary, vice president, and treasurer, respectively. The directors *13 of Wabash after July 1951 were petitioner and his sons, Philip and Sam. Petitioner was also the sole stockholder of Samar Trading Corporation (hereinafter referred to as Samar), a corporation organized and existing under the laws of the State of New York, was originally engaged in the cattle slaughtering business, but during the periods pertinent hereto had no business activity other than as holder of interests in real and personal property. Petitioner and his sons, Philip and Sam Bernstein, were the three directors of Samar. Petitioner was the president of Samar and Philip was the secretary and treasurer. From its inception in August 1950, Wabash incurred operating losses. As part of its operation, Wabash purchased, in 1950 and 1951, large amounts of live cattle from Julian G. Rogers of Lexington, Kentucky, and in January 1952 there was a remaining indebtedness to Rogers in the sum of $127,367.91. As of the close of its fiscal year ended September 30, 1951, Wabash had a surplus deficit of $39,762.29 and capital stock of $104,500. At this time its balance sheet showed accounts receivable of $589,304.80 and finished goods inventories of $241,224.08. It showed accounts payable of *14 $236,067.84 and notes and loans payable of $552,420.92 and accrued expenses for payroll and taxes of $10,819.76. After September 30, 1951, Wabash continued to operate at a loss and the last week in 1951 or the first week in 1952 ceased to slaughter cattle and to operate its plant. At that time Wabash had accounts receivable and other assets, the total value of which is not shown in the record. Petitioner's accountant estimated the total value of its assets to be between $140,000 and $150,000 sometime in late January 1952. The amounts of its total liabilities at the time it ceased operations and its surplus deficit are not shown in the record. At the close of its fiscal year ended September 30, 1952, Wabash had a surplus deficit of $165,800.50. At that time its balance sheet showed total assets of $20,315.69, accrued expenses for taxes of $82.81, accounts payable of $81,533.38 and no bonds, notes, or loans payable. On October 22, 1951, Wabash borrowed $75,000 from Samar and later in the year repaid $28,301.99 so that on December 31, 1951, Wabash was indebted to Samar in the sum of $46,698.01. In the year 1952, Samar made additional loans to or on behalf of Wabash in the total amount *15 of $103,733.29, and received repayments and/or loans from Wabash during that year totaling $152,263.33, so that, as of September 30, 1952, Samar had received $1,832.03 in excess of its total advances to or on behalf of Wabash. Wabash and Samar, in effect, maintained a running "loan and exchange" account. The balance of this account after February 29, 1952, generally showed Samar as indebted to Wabash in varying amounts. The posting dates in this account did not necessarily reflect the actual dates of the transaction recorded. The items were posted on the account at sporadic intervals when petitioner's son found it convenient to post Samar's books. Samar had guaranteed a loan made by A. H. Ackerman to Wabash in the amount of $50,000 which was paid in full during 1952. In late 1951 or early 1952 Wabash repaid a $20,000 loan which had been made to it by 2070 Realty Corporation, which corporation was owned by petitioner's sons. On January 16, 1952, petitioner, Wabash, and Rogers entered into an agreement in settlement of the $127,367.91 owed by Wabash to Rogers. Pursuant to this agreement, 3 checks totaling $23,992 were paid to Rogers by Wabash. Also, in accordance with this agreement, *16 there was delivered to Rogers on January 24, 1952, a series of notes consisting of 103 notes in the sum of $1,000 each and 1 note in a lesser amount, payable 1 note every week beginning March 3, 1952. All of the notes were guaranteed by petitioner. On January 16, 1952, when petitioner agreed to guarantee Wabash's notes, he was attempting to find persons to join him in reopening the Wabash plant for business. Subsequent to March 3, 1952, and prior to April 10, 1954, 41 of the aforesaid notes in the aggregate amount of $41,000 were paid, petitioner paying 17 of these notes in the aggregate amount of $17,000 and Wabash paying 24 of these notes in the aggregate amount of $24,000, leaving unpaid on April 10, 1954, a balance of 63 notes in the aggregate amount of $62,896.46. Of the $17,000 paid by petitioner, the sums of $4,000 paid in 1952 and $12,000 paid in 1953 were treated by him as "guarantors' losses" and claimed as deductions on his Federal income tax returns. Rogers wrote a letter dated March 5, 1954, to petitioner's accountant reading as follows: It has been some time since I heard from you and I am writing this letter requesting that you contact Max Bernstein with reference *17 to payment balance due. As you are aware we had these notes fixed payable weekly when you two came to Kentucky but later on we arranged to extend the time and allow Max to pay one note each month, I did not get any check for last month's note I have written him but he doesn't answer, he told me last fall that he was going to sell some property and would then clean up all of the notes that are still outstanding approximately $65,000. Will appreciate your prompt attention to this matter, Meanwhile I remain Rogers thereafter sent these unpaid notes to his New York attorney and threatened to institute suit against petitioner thereon. Petitioner at about this same time had heard that certain dealers in cattle thought that Rogers sometimes engaged in the practice of delivering cattle of a quality and weight less than that for which the purchaser was billed. Petitioner consulted his accountant and lawyer as to the possibility of his having a claim or counterclaim against Rogers. At a joint meeting of the board of directors and sole stockholder of Samar on April 7, 1954, the following resolution was unanimously adopted: RESOLVED, that this corporation acquire from JULIAN G. ROGERS, of *18 Lexington, Kentucky, all of his right, title and interest in and to the indebtedness due him from WABASH PACKING CORP., together with the promissory notes held by him, in the aggregate amount of $62,896.46, evidencing such indebtedness and issued by WABASH PACKING CORP. to his order on January 24, 1952; and it is further RESOLVED, that in consideration of the indebtedness and promissory notes so acquired, this corporation assign to the said JULIAN G. ROGERS the purchase money bond and mortgage made to it by D. & S. HOLDING CORP., dated April 10, 1951 given to secure the principal sum of $25,000 covering premises situate in the city of Long Beach, Long Island, New York, more particularly described in said mortgage, upon which there is now still unpaid the principal sum of $16,750, with interest thereon from February 1, 1954; and that this corporation further assign to said JULIAN G. ROGERS the chattel mortgage held by it and made by D. & S. HOLDING CORP. on April 10, 1951, given as additional security for the payment of said principal sum of $25,000, covering goods and chattels described in said annexed schedules and situate at the aforesaid premises; and that this corporation issue *19 and deliver to said JULIAN G. ROGERS its series of promissory notes in the aggregate amount of $10,000, each of said notes being in the sum $250of, payable monthly beginning May 1, 1956; and be it further RESOLVED, that the officers of this corporation be and they are hereby authorized to execute whatever documents may be necessary to effectuate this transaction. On April 10, 1954, petitioner, Wabash, Rogers, and Samar entered into an agreement providing as follows: AGREEMENT made as of the 10th day of April, 1954, by and between JULIAN G. ROGERS, of Lexington, Kentucky (herein called ROGERS); WABASH PACKING CORP., a New Jersey corporation (herein called WABASH); SAMAR TRADING CORPORATION, a New York corporation (herein called SAMAR); and MAX BERNSTEIN, residing at 1724 Popham Avenue, Bronx, New York (herein called BERNSTEIN); WHEREAS, BERNSTEIN is the sole stockholder of WABASH and is likewise the sole stockholder of SAMAR; and WHEREAS, WABASH is indebted to ROGERS for goods sold and delivered, which said indebtedness is evidenced by a series of promissory notes, in the aggregate sum of $62,896.46, issued by WABASH and endorsed by BERNSTEIN; and WHEREAS, a dispute has *20 arisen as to the amount of the indebtedness actually due to ROGERS and as to the collectability thereof; and WHEREAS, ROGERS has agreed to settle such indebtedness by transferring the same, together with the aforesaid promissory notes, to SAMAR, in consideration of the latter's assignment to ROGERS of certain mortgages hereinafter more particularly described, and the issuance of promissory notes to him by SAMAR in the aggregate amount of $10,000, as hereinafter provided, which notes are to be endorsed by BERNSTEIN. NOW, THEREFORE, it is agreed as follows: (1) ROGERS hereby transfers and assigns to SAMAR, without recourse and without making any representation whatever as to the amount actually due thereon or the collectibility thereof, all of his right, title and interest in and to the indebtedness due him from WABASH, and hereby agrees to endorse, without recourse, and deliver to SAMAR the series of promissory notes in the aggregate amount of $62,896.46 evidencing such indebtedness, all of said notes being dated January 24, 1952, made by WABASH PACKING CORP. to the order of JULIAN G. ROGERS, and endorsed by MAX BERNSTEIN. ROGERS hereby releases and discharges said WABASH PACKING *21 CORP. and MAX BERNSTEIN of any and all claims or demands, excepting such as arise from the terms of this agreement. (2) In consideration of the aforesaid transfer and assignment, provided in paragraph (1) hereof, SAMAR hereby agrees: (a) Upon the execution of this agreement, to deliver to ROGERS, in satisfactory form for recording and filing: (i) an assignment of a purchase money mortgage, made by D. & S. HOLDING CORP., as mortgagor, to SAMAR TRADING CORPORATION as mortgagee, given to secure the payment of the sum of $25,000.00, and interest, dated the 10th day of April, 1951, recorded on the 13th day of April, 1951 in the office of the Clerk of the County of Nassau in Liber 4249 of mortgages, page 170, covering premises situate in the city of Long Beach, Nassau County, New York, known as lot numbers 15, 16, 17 and 18, Block 131, in Section 59 of the land map of the County of Nassau, together with the bond described in said mortgage and the monies due and to grow due thereon with the interest, it being covenanted in said assignment that there is now owing upon said mortgage the principal sum of $16,750 with interest at 5 per cent per annum from February 1, 1954. (ii) an assignment *22 of a Mortgage on Goods and Chattels, made by D. & S. HOLDING CORP., as mortgagor, to SAMAR TRADING CORPORATION, as mortgagee, given as additional security for payment of the aforesaid sum of $25,000, and interest, dated the 10th day of April 1951, filed with the city of Long Beach, under number 20747, on the 11th day of April 1951, and with the Register of the City of New York, Kings County Office, under number 26599, on the 13th day of April 1951, covering goods and chattels described in the schedules annexed to said mortgage. (b) Upon the execution of this agreement, to issue and deliver to ROGERS a series of its promissory notes, in the aggregate sum of $10,000, each of which said notes shall be in the sum of $250, the first of which said notes shall be payable on the first day of May, 1956, and the subsequent notes payable monthly thereafter. All of said notes shall be personally endorsed by BERNSTEIN. (3) Except for the rights and obligations arising under this agreement, each of the parties hereto does hereby remise, release and forever discharge the other of said parties, their heirs, executors, administrators, successors and assigns, of and from all and all manner of actions, *23 causes of action, suits, proceedings, damages, claims and demands whatsoever in law or equity, which against the other parties he or it ever had, now has, or which their heirs, executors, administrators, successors or assigns hereafter can, shall, or may have for or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this agreement. (4) This agreement shall bind the parties hereto and their respective heirs, executors, administrators, successors and assigns. The agreement was signed by Rogers and by petitioner three times; on behalf of himself, on behalf of Samar, and on behalf of Wabash, respectively. The interest in the two mortgages transferred by Samar to Rogers was the only asset Samar had which was not already subject to a mortgage or claims of creditors. Prior to the negotiations leading to the agreement of April 10, 1954, Rogers had not looked to Samar for recovery on the balance due on the Wabash notes and did not know of Samar's mortgage receivables. Samar was dissolved in 1958. The Wabash notes which Rogers assigned to Samar pursuant to the agreement of April 10, 1954, were never paid by either Wabash or petitioner. They *24 were delivered by Rogers to Harry Merdinger, petitioner's accountant, who, in turn, delivered them to Louis Reiss, petitioner's attorney. The face or market value of the mortgages which Samar assigned to Rogers pursuant to the agreement of April 10, 1954, as well as the $10,000 of notes issued and paid by Samar to Rogers were never repaid by Wabash or by petitioner nor was suit ever brought against Wabash or petitioner by Samar to recover the value of the Wabash notes or to seek recompense for the amounts paid to Rogers. Samar never claimed a business expense deduction, a bad debt deduction, a loss deduction, or any deduction on any of its Federal corporate income tax returns with respect to the assignments and payments that it made to Rogers on the Wabash notes which it received pursuant to the agreement of April 10, 1954. In August 1955, Philip Bernstein, petitioner's son who was an accountant, made entries in Samar's General Journal as of December 31, 1954, debiting Loans Payable due from Max Bernstein in the amount of $16,911.47 and crediting Mortgage Receivable in the amount of $16,750 and interest income in the amount of $161.47 with the following explanatory note: "to *25 record transfer of mtge. [mortgage] receivable to J. G. Rogers on behalf of M. B. per agreement of 4-10-54 and to accrue interest earned on mtge. for period 2-1-54 to 4-10-54." The initials M. B. referred to petitioner. Philip also made an entry in Samar's General Journal debiting "surplus" in the amount of $15,220.87 and crediting "Loan Receivable Max Bernstein" in the same amount with explanatory note as follows: "to record dividend declared and paid which was credited to Max Bernstein L/A [loan account]." The recorded dividend, being $15,220.87 rather than $16,911.47, was calculated in an amount exactly equal to Samar's earned surplus as of December 31, 1954. Petitioner's 1954 Federal income tax return was prepared by his son Philip during the summer of 1955 and was signed by petitioner on August 11, 1955. On the return $15,220.87 was reported as a dividend from Samar and $17,911.47, composed of the mortgages in the value of $16,911.47 that had been transferred by Samar to Rogers and $1,000 paid by petitioner to Rogers on the notes guaranteed by him under the January 16, 1952, agreement, was claimed as a deduction for payment as a guarantor for Wabash. Petitioner, in 1954, *26 received a dividend from Samar in the amount of $15,220.87. No portion of the $17,911.47 paid to Rogers in 1954 on the Wabash notes has been shown to be an allowable deduction in computing petitioner's 1954 income. Opinion The first issue to be decided is whether there was a dividend either formally or informally declared and paid or constructively paid by Samar to petitioner. In the event we decide that there was an actual or constructive dividend to petitioner, the second issue is whether petitioner is entitled to a deduction under section 165 of the Internal Revenue Code of 1954 of $16,911.47 for a payment in discharge of his liability as guarantor of certain corporate notes. [1]
*27 Petitioner first contends that there never was a declaration of dividend either formally or informally by Samar to him and that the payment by Samar to Rogers of $16,911.47 in exchange for the Wabash notes, guaranteed by petitioner, and the release of petitioner from liability thereon do not constitute a dividend to petitioner. The respondent contends that a formal dividend had been declared by Samar and paid to or on behalf of petitioner. Respondent alternatively contends that in any event the payment by Samar to Rogers was for the benefit of petitioner and thus constituted a dividend to him. In support of the assertion that no dividend had been declared, petitioner relies on his own testimony, the testimony of his son, Philip, and the testimony of his accountant, Merdinger, all to the effect that no dividend had been declared or, in fact, even considered by the officers and directors of Samar at any time during the taxable year 1954. The respondent, on the other hand, points to the fact that all the testimony of these witnesses is in conflict with the documentary evidence, i.e., a dividend was recorded on Samar's books for the year 1954 and also a dividend was reported as income *28 on petitioner's income tax return for 1954 which return petitioner signed. Whether a dividend was actually declared by Samar, either formally or informally, is not determinative of the issue herein. When a corporation pays out of its surplus a debt of its sole stockholder with no intention of being repaid, it is the same for tax purposes as if the corporation had paid a dividend to its stockholder and the stockholder had utilized the payment to satisfy his debt. Wall v. United States, 164 F. 2d 464 (C.A. 4, 1947). Respondent argues that the factual situation in the instant case comes clearly within the holding in the Wall case. Petitioner does not contend that he was not indebted to Rogers except to the extent that he or Wabash might have a counterclaim against Rogers, nor does he contend that Wabash as of April 1954 had any assets to which Rogers could look for payment. As of September 30, 1952, Wabash had become hopelessly insolvent. Furthermore, it is clear from the letter that Rogers wrote to petitioner's accountant that Rogers in 1954 was looking to petitioner and not to Wabash for payment on the Wabash notes. Petitioner does not contend to the contrary. Neither *29 does petitioner contend that there was ever any intention that he or Wabash would pay to Samar any amount on the Wabash notes acquired by Samar under the April 10, 1954, agreement. In fact petitioner, in his argument, refers to these notes as being worthless when acquired by Samar and argues that under the April 10, 1954, agreement both he and Wabash were relieved of any obligation to make any further payments on these notes. Petitioner seeks to escape the holding of the Wall case by analogizing the present facts to Ruben, et al. v. Commissioner, 97 F. 2d 926 (C.A. 8, 1938), reversing 36 B.T.A. 604. In the Ruben case, a Court decree had been entered against Ruben along with two other individuals, a common law trust and Northwest Theatres Circuit, Inc., a corporation in which the taxpayer held a 25 per cent stock interest, ordering the rescission of the sale of and cancellation of an amount of stock in the Miles Theater Company held by Northwest and directing that $351,542.81 be paid over to a trustee named by the Court for the benefit of the plaintiffs. While an appeal from this decree was pending, a compromise settlement was brought about by the terms of *30 which Northwest paid $251,000 in full settlement of all claims against it and its codefendants in the decree. By this settlement Northwest retained the Miles Theater Company stock which it held and acquired 210 more shares of such stock not previously held by it. The Court of Appeals held that the payment by Northwest by which both it and Ruben, as well as the other defendants, were released from further liability did not constitute a dividend to Ruben to the extent of 25 per cent of the payment or to any extent. The Court of Appeals stated that Northwest comprised the liability in its own interest in that it was fully liable as a codefendant and had sufficient assets to pay the entire judgment and also that no identifiable items of income accrued to Ruben but rather that people who were making contested claims against Ruben ceased and desisted from making them and released him. Petitioner urges that the present case is analogous to the Ruben case because Samar had received a preferential payment from its debtor, Wabash, in violation of either section 15 of the New York Stock Corporation law [2] or section 14:14-2 of the New Jersey General Corporation law [3] and, therefore, the payment *31 by Samar to Rogers in return for the Wabash notes, whereby Samar, as well as petitioner, was released from all liability to Rogers was a compromise by Samar in its own interest with only incidental benefits accruing to petitioner. *32 The evidence herein is insufficient to establish to what extent, if any, Samar as a separate entity might have been liable to Rogers because of Wabash's indebtedness to Rogers. There is no precise showing in the record of when Wabash became insolvent. There is no evidence that Wabash was ever adjudicated a bankrupt. Wabash ceased its normal operations in late 1951 or early 1952. There is evidence that at this time Wabash had accounts receivable and other assets but there is no evidence as to its total liabilities at this time. There is no evidence as to the total assets and liabilities of Wabash at any time between September 30, 1951, and the time that it ceased its normal operations. Wabash's corporate income tax return for its fiscal year ended September 30, 1952, shows sales of $3,960,042.71 and costs of goods sold of $3,834,664.36. Since it ceased its normal operations at least by early 1952, the cost of goods sold must have represented costs in the September 30, 1951, inventory plus costs incurred some time between September 30, 1951, and early 1952. How much of this total amount consisted of purchases from Rogers for which he was paid during the last 3 months of 1951 is not *33 shown in the record. As of January 1, 1952, Wabash was indebted to Samar in the amount of $46,698.01 and was indebted to A. H. Ackerman on a loan guaranteed by Samar to the extent of $50,000. Some time between January 1, 1952, and September 30, 1952, both of these loans were repaid, but there is no showing that Wabash was insolvent at the time such repayments were made. Also, in late 1951 or early 1952, a $20,000 loan was repaid by Wabash to 2070 Realty Corporation. The record does not show how much was paid by Wabash to Rogers or to any other creditors between September 30, 1951 and January 1, 1952, except the $28,301.99 repayment to Samar and the repayment to 2070 Realty Corporation as above stated. As of September 30, 1951, Wabash had accounts payable and outstanding notes and loans totaling $788,488.76. How much of this indebtedness was paid prior to January 1, 1952, and how much thereafter, the record does not show, nor does it show to whom the amounts were owing. After January 1, 1952, there were payments by Wabash to Rogers. The amount of $23,992 was paid by checks delivered to Rogers in January 1952 and another $24,000 at some undisclosed time prior to April 1954. In addition, *34 petitioner had paid Rogers $17,000 of which $4,000 was paid in 1952. So far as this record shows, during the entire period from September 30, 1951, throughout the balance of that year, the insolvency of Wabash might have been imminent, or at some time during that period it actually might have been insolvent. So far as this record shows, during this same period there might have been payments in large amounts made to Rogers on cattle purchased during that period or prior thereto. Petitioner who was the chief officer and a director of Wabash might have been personally liable had he intentionally caused Wabash to give preference to Samar. But petitioner, on January 24, 1952, became personally liable to Rogers as guarantor on Wabash's notes. The evidence herein is totally inadequate to establish that any preference was given to Samar by Wabash in such a manner as to create a separate liability, under the provisions of either the New Jersey or New York laws, from Samar to Rogers for all or any part of the $62,896.46 remaining unpaid on the Wabash notes on April 10, 1954. Cf. Turp v. Dickinson, 100 N.J. Eq. 24, 134 Atl. 888 (1926); Havens v. Mohme Aero Engineering Corporation, 135 N.J. Eq. 481, 39 A. 2d 108 (1944); *35 Todarelli v. Visigraph Typewriter Mfg. Co., 34 F. Supp. 762 (D.C. N. Y., 1940); and Shaw v. Jewel Radio Corporation, 174 N.Y.S. 2d 315 (S.C. N. Y., 1958). Since petitioner has not shown that Samar was separately liable to Rogers the instant case is distinguishable from the Ruben case for the reasons stated in Irving Sachs, 32 T.C. 815, affd. 277 F. 2d 879 (C.A. 8, 1960). This case is further distinguishable from the Ruben case in that in the Ruben case a judgment had been rendered against the corporation whereas it is abundantly clear from the record in the instant case that at the time of the April 10, 1954, settlement Rogers did not consider Samar to be in any way liable to him and that the payment by Samar to Rogers was made in the interest of and on behalf of petitioner. Prior to the April 10, 1954, settlement, Rogers looked only to petitioner for satisfaction of the debt due him. Petitioner did not question his liability on the notes except to the extent that he might have some possible counterclaim. Rogers had sent the unpaid Wabash notes to lawyers in New York City and was threatening to institute a suit against petitioner. *36 It appears that Rogers had no direct information of the existence of Samar until just shortly before the April 10, 1954, settlement, and only then was he informed of its existence because petitioner offered to transfer to Rogers in satisfaction of the Wabash notes Samar's interest in two mortgages which petitioner claimed were the only asset free of creditors' claims that he had available. It is clear that the only reason Samar was brought into the April 10, 1954, settlement was because it did hold this "free asset" which was available to petitioner and not because of any supposed liability as a preferred creditor on payments made by Wabash more than 2 years before. Petitioner contends in the alternative that he is entitled to a deduction in the amount of $16,911.47 under section 165(c)(2) of the Internal Revenue Code of 1954[4] for a loss incurred in a transaction entered into for profit. Respondent argues that petitioner had no reasonable expectation that Wabash would be able to pay its notes to Rogers at the time the guaranty was made and that, therefore, the amounts paid by petitioner under the guaranty were contributions to capital of Wabash or gifts. *37 In the alternative respondent argues that these amounts are non-business bad debts under the holding in Putnam v. Commissioner, 352 U.S. 82, affirming 224 F. 2d 947, affirming a Memorandum Opinion of this Court. Since respondent's determination was that the claimed deduction was not allowable under any section of the Code, the full burden is upon petitioner to establish his right to the deduction. This petitioner has failed to do. The precise date when Wabash became insolvent is not clear in the record. It was solvent at September 30, 1951, and hopelessly insolvent at September 30, 1952. Petitioner testified that at the time he guaranteed the notes of Wabash to Rogers he was attempting to get some others interested in that corporation and get it operating again. There is no showing that petitioner had any reasonable prospect of being successful in his effort. Petitioner has failed to meet his burden of establishing that his guaranty of the Wabash notes was with the reasonable expectation that they would be paid by the corporation and that the loss sustained when he was required to make good on his guaranty was an allowable deduction in computing his taxable *38 income. George B. Markle, Jr., 17 T.C. 1593 (1952). Footnotes
1. Respondent's notice of deficiency stated: (b) It has been determined that a deduction of $17,911.47 indicated in your 1954 return as "paid to J. G. Rogers, Lexington, Kentucky, on guarantee for Wabash Packing Corp. after insolvency of debtor corporation" is not allowable as a business bad debt under Section 166 (a) of the Internal Revenue Code of 1954 nor is it allowable under any other section of the Code. Petitioner conceded at the trial that the $1,000 paid by him to Rogers in cash in 1954 is not deductible as a business bad debt.↩
2. Sec. 15. Prohibited transfers to officers, stockholders, directors or creditors. No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash. No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid, except as to any rights or interests which may be acquired thereunder by any person without notice or reasonable cause to believe that such conveyance, assignment, transfer, payment, judgment, lien or security would effect a preference, and except also that laborers' wages for services shall be preferred claims and be entitled to payment before any other creditors out of the corporation assets in excess of valid prior liens or incumbrances. No corporation formed under or subject to the banking, insurance or railroad law shall make any assignment in contemplation of insolvency. Every person receiving by means of any such prohibited act or deed any property of a corporation shall be bound to account therefor to its creditors or stockholders or other trustees. * * * ↩
3. New Jersey Statutes Annotated, Title 14, Corporations General Sec. 14:14-2. Conveyances, assignments or transfers after insolvency or in contemplation of insolvency void as against creditors; bona fide purchasers; exceptions When any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its real or personal property, choses in action, rights or credits, nor shall they or any of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency. Any such sale, conveyance, assignment or transfer shall be null and void as against creditors, except that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency shall not be invalidated or impeached. * * *↩
4. Sec. 165(c)(2) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and Decision will be entered for respondent. ↩