In the Matter of **ANJOPA PAPER & BOARD MANUFACTURING CO., Inc., Bankrupt.**

No. 93218.

United States District Court
S. D. New York.

April 6, 1967.

Krause, Hirsch, Gross & Heilpern, New York City, for the Trustee in Bankruptcy. George J. Hirsch, New York City, of counsel.

Goldstein, Judd & Gurfein, New York City, for F.D.I.C. as Receiver of the Home National Bank of Ellenville. Orrin G. Judd, Earle K. Moore, Thomas R. Asher, New York City, of counsel.

Leslie H. Fisher, Asst. Gen. Counsel, Washington, D. C.

## OPINION

COOPER, District Judge.

This petition of the Federal Deposit Insurance Corporation (hereinafter F.D.I.C.) seeks review of an order dated November 6, 1964 of the Referee in Bankruptcy, R. Lewis Townsend, setting aside certain preferential transfers made to it by the bankrupt Anjopa Paper & Board Manufacturing Company, Inc. (hereinafter Anjopa).

### SUMMARY OF FACTS

A review of a rather extensive and somewhat concentrated record before us reveals that Anjopa was engaged in the manufacture of paper products and owned a plant in Ellenville, New York. From June 1951, when the company started operations with its president, Joseph Di Candia, through November 1956 Anjopa obtained substantial amounts of capital from the Home National Bank of Ellenville (hereinafter the Bank). On November 30, 1956, national bank examiners discovered evidence of gross irregularities in the Bank's affairs and a substantial shortage. That same day, the president of the Bank, William R. Rose, confessed to agents of the Federal Bureau of Investigation that the Anjopa loans had not been authorized by the Directors of the Bank, and that they were secretly obtained by Di Candia through the falsification of Bank records by Rose whereby Anjopa's account was overstated, thus permitting the company to draw against a non-existent balance. A subsequent audit revealed that there was a shortage in excess of $1,000,000 almost all of it representing advances to

Anjopa. The Bank was closed on December 3, 1956. The next day F.D.I.C. was appointed Receiver of the Bank by order of the Comptroller of the Currency acting under the authority of Title 12 of the United States Code, Section 1821(c).[1]

F.D.I.C., as receiver for the creditor bank, attempted to recoup Anjopa's indebtedness. It held conferences with Di Candia and his accountant to determine, among other things, Anjopa's business prospects, its then financial condition, and the alternative methods by which F.D.I.C. could protect the Bank's advances. On December 20, 1956, real and chattel mortgages with an underlying note for $800,000 were executed by Di Candia and delivered to F.D.I.C.; recording thereof took place the next day. The plant continued to operate under Di Candia's direction until it was closed in December 1957.

In March 1957 F.D.I.C. obtained an appraisal of the plant. Trustee's Ex. 12. This indicated that the plant was worth some $300,000 as a going concern, a figure much less than expected. By letter dated March 25, 1957 F.D.I.C. called a meeting of Anjopa's creditors for April 2, 1957 when it advised them for the first time of the existence of the December 20, 1956 mortgages. The letter also stated (Trustee's Ex. 23):

> On the basis of the financial statements given to the Receiver by 'Anjopa', the appraisal of its assets that has been made by the Receiver, and a resume of its operational statements since the closing of the bank, it is evident that 'Anjopa' cannot be expected to liquidate its heavy indebtedness within a reasonable time.

At the meeting and in face of creditor opposition, F.D.I.C. confirmed its intention to keep its mortgages. The creditors present took the position that the mortgages might be preferential transfers under Section 60 of the Bankruptcy Act. F.D.I.C., on the other hand, justified its lien on the plant and machinery pointing out that Bank funds had been used in Anjopa's capital expansion, and that they had cancelled checks to prove it.

Although the period in which creditors could have attacked the mortgages under Section 60 had elapsed on April 20th, after further talks with the creditors, F.D.I.C. in July, 1957 entered into a compromise agreement with Anjopa. In consideration of waiver by the creditors of any rights to challenge the validity of the mortgages it held, F.D.I.C. agreed to compromise its claim of over $1,000,000 in exchange for $100,000 in third-party notes (representing some of Anjopa's accounts receivable) and $200,000 in four semi-annual payments of $50,000 beginning one year thereafter. Pursuant to 12 U.S.C. § 192 the necessary judicial approval of such an agreement by a court having jurisdiction in the local community, viz., the New York Supreme Court, was obtained.[2]

On December 10, 1957 Di Candia was sentenced by a Judge of this Court to three years for misappropriation of national bank funds. The plant closed three days thereafter.

On March 21, 1958 an involuntary petition in bankruptcy was filed against Anjopa; it was adjudicated a bankrupt on April 8, 1958, all further proceedings being referred to the Honorable Normington Schofield, Referee in Bankruptcy. Anjopa defaulted under the above compromise agreement by failing to meet the

---

1. "Notwithstanding any other provision of law, whenever the Comptroller of the Currency shall appoint a receiver other than a conservator of any insured national bank or insured District bank, or of any noninsured national bank or District bank hereafter closed, he shall appoint the Corporation [the F.D.I.C.] receiver for such closed bank."

2. Section 192 provides, *inter alia:* "Such receiver * * * shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts * * *."

first payment of $50,000 due in July 1958. Accordingly, F.D.I.C.'s mortgages were never cancelled, nor was the debt (less collections of $95,201 on the notes) compromised.

By order dated June 19, 1958 the Referee granted F.D.I.C. permission to foreclose its mortgages. At the foreclosure sale on March 2, 1959 and after some bidding, F.D.I.C. purchased the plant and real property for $80,000 which sum was applied as a reduction of the total indebtedness of the bankrupt to F.D.I.C. After fees, allowances, and other expenses the net reduction amounted to $38,533.21. The property was resold to American Paper and Board Manufacturing Company, Inc. (hereinafter American Paper) on August 19, 1959. F.D.I.C. received a down payment of $25,000 and a purchase money mortgage of $200,000, installments to be paid over a period of eight years at 4% interest. In addition, American Paper assumed a prior mortgage of $13,700. After making some payments toward the $200,000 mortgage, American Paper defaulted.

A second foreclosure sale was held in November 1961, and F.D.I.C. again bid on the property. On May 15, 1962 it entered into an agreement to sell the property to Channel Master Corporation for $68,200.

### THE TRUSTEE'S PETITION

The instant proceedings were initiated by the trustee in bankruptcy by notice of motion dated March 6, 1959. In substance, the trustee's petition alleged that Anjopa's transfers to F.D.I.C. of property (the December 20 mortgages) and cash (the third-party notes upon which $95,201 was realized) were in violation of Section 15 of the New York Stock Corporation Law, McKinney's Consol.Laws, c. 59, because they were made: (1) at a time when the bankrupt was insolvent, or its insolvency was imminent; (2) with intent to prefer F.D.I.C. over other creditors, and (3) with F.D.I.C.'s knowledge (or reasonable cause to believe) of the insolvency and intent to prefer. The petition sought an order disallowing the bankruptcy claim filed by F.D.I.C. as a general creditor and an affirmative judgment setting aside the transfers made by Anjopa, and requiring F.D.I.C. to surrender them or their proceeds to the trustee.

Numerous hearings thereon were held before Referee Schofield. By memorandum decision dated April 14, 1962 the Referee found that F.D.I.C. had violated Section 15, and the trustee's motion was granted. However, the Referee did not set aside the transfers, since F.D.I.C. had already sold the mortgaged property to American Paper and collected on the notes. Instead, he held that the order to be entered pursuant to his decision should (page 8):

> "provide for the payment to the Trustee of the purchase price that F.D.I.C. received in the sum of $238,700.00 less any expenditures or credits to which it may be entitled * * * to be agreed upon by the parties or determined by a future hearing * * * plus the payment by F.D.I.C. to the Trustee * * * which it received for [the notes]."

The parties not being able to agree on the credits, a hearing was held on June 21, 1962. On that day F.D.I.C. also sought to re-open the hearings with regard to the trustee's petition, especially with respect to the Referee's ruling that F.D.I.C. pay the trustee $238,700 (less expenses), an amount much in excess of what was actually received for the property from American Paper. Referee Schofield reserved decision. Further, F.D.I.C. sought an order approving the then pending sale of the property to Channel Master Corporation; this motion was denied in a decision rendered the next day, although no order was entered thereon. Referee Schofield died on June 1, 1963.

Referee R. Lewis Townsend was appointed to succeed Referee Schofield by order dated July 1, 1963. As of that date, no findings of fact or conclusions of law had been entered upon the April 14, 1962 memorandum decision, nor had any

decision been rendered with respect of the motion for the credits to be allowed, and the motion to re-open.

By stipulation filed January 6, 1964, consented to by the United States Attorney, the trustee and F.D.I.C. agreed that:

(1) All motions, hearings, proceedings, and pleadings had herein and the entire record thereof, including the testimony taken and evidence introduced in connection therewith, had before Referee Schofield shall be deemed as though taken, submitted to, and heard by Hon. R. Lewis Townsend * * * except as to * * * [the motion for approval of the sale to Channel Master].

(2) * * *

(3) Referee Townsend * * * shall have in all respects the power and duty to determine all motions and issues of fact and law in the within proceeding * * * as though taken, submitted to and heard by said Hon. R. Lewis Townsend, without being bound by * * * [Referee Schofield's] decision dated April 14, 1962.

Referee Townsend made his determination on March 4, 1964 wherein he: (1) adopted the April 14, 1962 decision of Referee Schofield; (2) denied the motion to re-open the hearing, and (3) allowed F.D.I.C. certain credits. Proposed findings of fact and conclusions of law were submitted by both the trustee and F.D. I.C. in June 1964, and by decision dated September 15, 1964 the trustee's submission was adopted *in toto*. An order thereon was filed November 6, 1964; it is the basis of this appeal.

It provided that:

The claim of F.D.I.C. heretofore filed against the bankrupt estate, be and it is hereby disallowed unless claimant F. D.I.C., within thirty days from the date hereof, (a) assign to the Trustee in Bankruptcy the uncollected notes receivable assigned to it by the Bankrupt

in the face amount of $7,050.60 which said F.D.I.C. is hereby ordered to do, and (b) pays to the Trustee * * * the sum of $288,702.69, with interest on $193,503.35 from December 20, 1956 and on $95,199.34 from July 31, 1957, at the rate of 6% per annum * * *.

Unless F.D.I.C. complied with the above provision, it was further ordered that the trustee would have affirmative judgment against F.D.I.C. for the amounts and interest stated.

PETITION FOR REVIEW

 By petition dated November 12, 1964 F.D.I.C. seeks review of this order. It alleges numerous errors of fact and law. As required by General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53, we accept the Referee's findings of fact unless clearly erroneous. The test is similar to that found in Rule 52(a), F.R.Civ.P. In Re Tabibian, 289 F.2d 793 (2 Cir. 1961). "Both the resolution of conflicting testimony and the drawing of factual inferences from circumstantial evidence are protected by the 'unless clearly erroneous rule.'" In Re Hygrade Envelope Co., 366 F.2d 584, 588 (2d Cir. 1966). Where credibility is not involved and the facts are undisputed it has been said that the Court "may more freely draw differing inferences" than the Referee. McChesney v. Sims, 267 F.2d 215, 217 (2d Cir. 1959). On review, the burden of proving error is on petitioner. In re Love B. Woods & Co., 222 F.Supp. 161 (S.D.N.Y.1961).

 F.D.I.C. questions the usual application of the not clearly erroneous rule in this case. In answer to the trustee's statement (Memorandum of Law, pp. 1, 13) that two Referees chose not to credit the testimony of F.D.I.C. officials F.D. I.C., for the first time, argues that since "one of them made no findings, and the other did not hear the witnesses, this Court is free to decide the issue [whether there were preferential transfers] itself from the record." [3] Reply Memo-

3. F.D.I.C. does not specify whether in its view the Court is free to determine all fact issues *de novo*, whether some weight should be given to some, if not all, of the Referee's findings, or who has the burden of proof. Of course, with regard to the

randum, p. 3. We cannot agree for two reasons.

■ One, the argument is without merit in view of the stipulation signed by F.D.I.C. granting Referee Townsend full "power and duty to determine * * issues of fact * * * as though * * heard by * * *" him. The choice was the parties'—the stipulation obviated the necessity of a trial *de novo*, and we are presented with no reason why its clear language (and the consequences thereof) should be avoided, nor any reason why the facts could not be reasonably found by Referee Townsend, who though not bound by Referee Schofield's decision which resolved the testimonial conflicts, had the benefit thereof.

■ Second, independent of the stipulation we reach the same conclusion. The clearly erroneous rule is mandated by General Order No. 47 even though the Referee was not in a particularly better position than we to judge matters of credibility. Cf. Summers v. Watkins Motor Lines, 323 F.2d 120 (4th Cir. 1963); United States v. Aluminum Co. of America, 148 F.2d 416, 433 (2d Cir. 1945). As a matter of proper judicial administration, it should not be the province of the reviewing court to "second guess" the Referee. The weight of authority favors the view that in applying the clearly erroneous test, findings of fact not based on the trier's direct observation of witnesses, as here, should be given the same weight (not just "slight" or a little less) as those which are based on the trier's observation of witnesses, otherwise thought to merit the greatest weight. See Lundgren v. Freeman, 307 F.2d 104, 113–115 (9th Cir.1962); 2B Barron & Holtzoff, Federal Practice § 1132 (Wright ed. 1961); Wright, The Doubt-

ful Omniscience of Appellate Courts, 41 Minn.L.Rev. 751, 764–71 (1957); Note, 49 Virg.L.Rev. 506 (1963).[4]

## SECTION 15 OF THE NEW YORK STOCK CORPORATION LAW

The trustee in seeking to recover for the estate the mortgages given in 1956 and the account receivable notes given in 1957, relied principally upon this section.

■ It was enacted to prevent unjust discrimination of one creditor of an insolvent corporation over another by securing "equality in the distribution of the assets of a failing corporation." Dalziel v. Rosenfield, 265 N.Y. 76, 79, 191 N.E. 841, 842 (1934). It provides, in pertinent part, that:

* * * No conveyance, assignment or transfer of any property of any such corporation by it or by an officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer * * * when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid, except as to any rights or interests which may be acquired thereunder by any person without notice or reasonable cause to believe that such conveyance, assignment, transfer, payment, judgment, lien or security would effect a preference * * *. Every person receiving by means of any such prohibited act or deed any property of a corporation shall be bound to account therefor to its creditors or stockholders or other trustees. * * * Every transfer or assignment or other act done in violation of the foregoing

findings of law or the application of a legal standard to fact such as in the determination of a preferential transfer, this Court is in no wise bound by the Referee's decision. In Re Hygrade Envelope Co., supra.

4. We do not mean to imply, however, that we would reach a different conclusion than

the Referee were it not for the clearly erroneous rule. We have carefully examined the entire transcript in this case, and except where indicated (note 30 infra), the Referee's findings of fact are well grounded by the evidence (or the lack thereof).

provisions of the section shall be void * * *.[5]

It is applicable to this proceeding by virtue of Section 70(e) (1)[6] of the Bankruptcy Act which incorporates state law for purposes of enabling the trustee to invalidate a preferential transfer made by an insolvent debtor. The Referee held that there were two such preferential transfers: (1) the mortgages in December 1956,[7] and (2) the third-party notes in July 1957. The trustee sought to rely on Section 15, because it has a six year statute of limitations, whereas its counterpart, Section 60 of the Bankruptcy Act, has a four month limitation period, and the transfers complained of would be without that period. See Schutte v. Wittner, 149 F.Supp. 451 (E.D.N.Y.1957).

F.D.I.C. offers the following arguments on this petition: (1) Section 15 is inapplicable. (2) If Section 15 is applicable the trustee does not have standing to invoke it. (3) Even if the trustee has standing, F.D.I.C. has not violated Section 15.

### APPLICATION OF SECTION 15 TO F.D.I.C.

 F.D.I.C. maintains that Section 15 was not applicable to it as a receiver of a national bank and/or in its capacity as a federal agency. Memorandum of Law, pp. 45–58. The Referee held that: (1) F.D.I.C. had waived this "defense" by failing to plead and timely assert it; (2) even if it could be raised, federal statutory law, viz., Section 70(e) of the Bankruptcy Act and 12 U.S.C. § 1819 of the Federal Reserve Act permitting F.D.I.C. "to sue and be sued" compelled application of Section 15. At the outset we note that F.D.I.C.'s contention must be considered on the merits for the reasons stated in its brief (pages 55–58), and for the additional reason that we are charged with the responsibility of affording the proper relief "regardless of the theories urged by the parties." Massachusetts Bonding & Ins. Co. v. State of New York, 259 F.2d 33, 40 (2d Cir. 1958).

 While F.D.I.C. has been granted the power to "sue and be sued, complain and defend, in any court of law or equity, State or Federal," (12 U.S.C. § 1819) the substantive law to be applied in such suits is a "federal question." F.D.I.C. v. Rectenwall, 97 F. Supp. 273 (N.D.Indiana 1951). "A federal court sitting in a non-diversity case * * * does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state." D'Oench, Duhme & Co. v. F. D. I. C., 315 U.S. 447, 471, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (concurring opinion, Jackson, J.). This is so not only because F.D.I.C. is a federal agency, but because its enabling legislation contains the provision (now found in 12 U.S.C. § 1819) that: "All suits of a civil nature at common law or in equity to which the corporation shall be a party shall be deemed to arise under the laws of the United States." See 1A Moore, Federal Practice ¶ 0.321 n. 23 (1965 ed.). Further, the mandatory appointment of F.D.I.C. as a receiver of an insured national bank (12 U.S.C. § 1821(c)) subjects it to the provisions of the National Banking Act with regard to the liquidation and/or rehabilitation of insolvent banks (12

---

5. New York's new Business Corporation Law, McKinney's Consol.Laws, c. 4, effective September 1, 1963, largely omits this provision.

6. The provision reads as follows: "(e) (1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this Act which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this Act, shall be null and void as against the trustee of such debtor."

7. A mortgage is a "lien" or "transfer" under Section 15. Karasik v. Peoples' Trust Co., 252 F. 324, 334–335 (E.D.N.Y.1917), aff'd 252 F. 337 (2d Cir. 1918).

U.S.C. §§ 191–197).[8] And "questions concerning the exercise of the power and authority to administer the closed bank's affairs are federal questions." Rosenberg v. Deitrick, 37 F.Supp. 700, 704 (D. Mass.1940).

Where the federal statute makes express or implied reference to state law, there can be no doubt that state law applies.[9] But where, as here, neither act attempts to define the rights and liabilities of F.D.I.C. in its capacity as receiver, the "answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." United States v. Standard Oil Co., of Cal., 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947). Some of the factors to be weighted are: the need to protect the government purse; the need for uniformity; the source or nature of the right sued upon; the degree of state interest involved; the dependency of the activity on state law;[10] the conflict if any between state law and federal interests; the degree of specificity found in the federal statute.

The overriding governmental interests calling for the application of a wholly federal rule found in such cases as Clearfield Trust Co. v. United States, 318 U.S. 363, 366, 63 S.Ct. 573, 87 L.Ed. 838 (1943) and D'Oench, Duhme & Co. v. F. D. I. C., supra are in no wise present here. Rather, the rights underlying F.D.I.C.'s liquidation of the Bank's assets find their source in state law. It was subrogated to the rights of the Bank against Anjopa as well as the Bank's other debtors. See Brown v. New York Life Ins. Co., 58 F.Supp. 252 (D.Ore.1944), aff'd 152 F. 2d 246 (9th Cir. 1945); 12 U.S.C. § 1821(d). Generally, the receiver of a national bank takes title to the bank's claims against its debtors subject to all the existing rights and equities. Peoples-Ticonic Nat'l Bank v. Stewart, 86 F.2d 359, 361 (1st Cir. 1936). Thus, in Willcox v. Goess, 16 F.Supp. 350 (S.D. N.Y.1936), modified 92 F.2d 8 (2d Cir. 1937) preferential transfers under Section 15 were recovered against the receiver of Harriman National Bank and Trust Company for the bank's prior receipt thereof. In comparison to the *D'Oench* case where the assignee F.D. I.C. obtained a greater right than its assignor because of the strong federal policy involved,[11] application of Section 15 in *Willcox* against the subrogee of the bank's rights was not so repugnant as to upset the usual rule. Conversely, "the National Bank Act confers on the receiver * * * no greater powers than the bank itself had before insol-

---

8. In September, 1959 Pub.L. 86–230, § 18, 73 Stat. 458, 12 U.S.C. § 197 was amended so as "to transfer from the Comptroller of the Currency to F.D.I.C. specified functions in connection with national bank receiverships * * *. Since the Comptroller does not supervise or direct the actions of F.D.I.C. as receiver of an insured national bank, the bill would transfer the supervising duties of the Comptroller to F.D.I.C." 1959 U.S.Code Cong. & Ad.News at p. 2236. See 12 U. S.C. § 1821(d); F.D.I.C. Memorandum of Law, pp. 72–73.

9. For example, the Federal Reserve Act contains the proviso (12 U.S.C. § 1819): "that any suit to which the Corporation is a party in its capacity as a receiver of a State bank and which involves only the rights or obligations of depositors, credi-

tors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States." Under this provision F.D.I.C. has been authorized to act in the capacity of a receiver for a state insured bank, and claims arising out of its activities are governed by local law. See 12 U.S.C. § 1821 (e); Freeling v. Sebring, 296 F.2d 244 (10 Cir. 1961). In the instant case F.D. I.C. was the receiver for a national not state bank. For definitions, see 12 U.S.C. § 1813.

10. See Board of County Commissioners, Jackson County, Kansas v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939).

11. See 3 Moore, Federal Practice ¶ 17.21 n. 8 (1965 ed.).

vency * * *." Dunn v. O'Connor, 67 App.D.C. 76, 89 F.2d 820, 825 (1937); Peoples-Ticonic Nat'l Bank v. Stewart, supra. As Professor Moore maintains, "a government corporation as assignee, should obtain no greater rights than its assignor had, except to carry into effect some overriding federal policy beyond the fact of governmental incorporation." [12] 3 Moore, Federal Practice ¶ 17.23 at 1402.

We find no reason to grant the stockholders of the Bank a greater percentage of recovery on Anjopa's debt when F.D.I.C. is the receiver than they would have received if the Bank tried to collect in its own right.[13] The instant transactions are neither federal in character nor do they relate to government property.

Similarly, we find no reason to prefer the Bank (apart from its equitable lien) over other creditors in sharing the remaining assets of Anjopa's estate. No such right is envisioned in the Act. Furthermore, the state has a valid interest in securing the equitable distribution of insolvent estates. Moreover, no federal rule of priority is herewith involved, and the local law does not conflict with the Act. Cf., Rosenberg v. Deitrick, supra. Here, state law has furnished a convenient solution "in no way inconsistent with adequate protection of the federal interest." United States v. Standard Oil Co., supra 332 U.S. at 309, 67 S.Ct. at 1609.

Drawing upon the Bankruptcy Act, F.D.I.C. makes two arguments against the application of Section 15: (1) that

Section 70(e) of the Bankruptcy Act does not permit state proceedings against the "United States"; (2) Section 60 is "adequate to protect against any abuse by F.D.I.C. of the rights of other creditors." Memorandum of Law, pp. 49, 51. We disagree.

First, F.D.I.C. is not protected by sovereign immunity as was the United States in the cases cited. See Keifer & Keifer v. R.F.C., 306 U.S. 381, 59 S. Ct. 516, 83 L.Ed. 784 (1939); United States v. Brown, 41 F.Supp. 838 (S.D. Fla.1941); 3 Collier, Bankruptcy, supra ¶¶ 60.16 n. 3, 60.58 n. 6; 4 Collier ¶ 70.92 n. 75a.

Second, reference in Section 70 (e) to state law evinces Congressional intent to provide an additional remedy to Section 60.[14] Thus, the federal policy of the Bankruptcy Act in achieving the equitable distribution of a bankrupt estate is to be achieved with the help of state law. In the instant case, but for the expiration of the four month limitation period of Section 60, these transfers would be struck down under that section. In effect, reference to Section 15 increases that statute of limitation period, a result contemplated by the Act. Cf., Early v. City of Helena, Ark., 87 F.2d 831 (8 Cir. 1937). "Section 70(e) (1) affords a useful weapon for the trustee in those cases where the bankrupt has arranged things prior to four months before the filing of a bankruptcy petition so as to prefer some * * * of his creditors * * *." 4 Collier, Bankruptcy, supra ¶ 70.88 at 1721; see also 3 Collier ¶ 60.66.

---

12. They should be in no better position as defendants than if they had brought suit in the state or federal court for the amount of their recovery in the first place. Of course, they would not be necessarily limited to suing under a state created right. United States v. Standard Oil Co., supra; F.D.I.C. v. Rectenwall, supra. But the same considerations as would be applicable in deciding to create such a different cause of action are also relevant in creating a defense.

13. Under 12 U.S.C. § 197 after depositors have been paid the stockholders have the option to continue F.D.I.C. as receiver or to appoint an agent to liquidate the remaining assets.

14. The direct reference in the federal statute to state law does not pretermit the above discussion of the applicable law, because state law does not apply *ex proprio vigore* to the acts of F.D.I.C. as receiver of the Bank.

## STANDING OF THE TRUSTEE
## TO PROCEED

### A. Existence of a Creditor with a Provable Claim

The right of the trustee in bankruptcy to set aside the alleged preferential transfers in this case is predicated on Section 70(e) of the Bankruptcy Act. This section invests the trustee with the same rights which an existing individual creditor would have under state law to complain of a preferential transfer. Doyle v. Gordon, infra 158 N.Y.S. at 256; Haberman v. Larens Corp., infra; Cardozo v. Brooklyn Trust Co., infra. Having no independent power of avoidance, the trustee is subject to the same limitations as the creditor in whose shoes he is standing. However, assuming the creditor could avoid the transfer, the extent of the trustee's recovery is not limited to that of the creditor's.

Redress under Section 15 is only available to those creditors whose debts accrued prior to the preferential transfers, and the consent of such a creditor to a prohibited transfer, as when the creditors approved the compromise agreement, may bar a subsequent action. In Re Campbell's Estate, 164 Misc. 632, 299 N.Y.S. 442, 448 (Surr. Ct.1937). Further, while an injured creditor cannot sue until a judgment on his debt is obtained and returned unsatisfied, Buttles v. Smith, 281 N.Y. 226, 22 N.E.2d 350 (1939) this is not required of the trustee in bankruptcy. See Sherwood v. Hollbrook, 178 App.Div. 462, 165 N.Y.S. 514 (1st Dept. 1917); 4 Collier, Bankruptcy ¶ 70.90 at 1728–29 (1962 ed.). The creditor of the transferor need not have a judgment lien prior to the transfer, although his recovery under Section 15 in such a case will be greater than if he had obtained it after. Compare Trustees of Masonic Hall & Asylum Fund v. Fontana, supra with Hewlett Park Co. v. 1193–1205 East Broadway of Hewlett, Inc., 32 Misc.2d 691, 223 N.Y.S.2d 756 (Sup.Ct. 1961), aff'd 17 App.Div.2d 736, 232 N.Y.S.2d 391 (1st Dep't. 1962).

The Referee's decision fails to make clear that a prohibited transfer must actually result in a preference of one creditor over another. Haberman v. Larens Corp., supra. Given a condition of insolvency, the liquidation of a particular creditor's antecedent debt *ipso facto* results in a preference. Palmer Clay Products Co. v. Brown, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1935). Where, as here, there has been a partial liquidation of various creditors' claims, the determination of a preference, similar to that made under Section 60, involves a comparison of each creditor-transferee's percentage of recovery. See Ely v. Greenbaum, 85 F.2d 501 (2d Cir. 1936); Jentzer v. Viscose Co., 82 F.2d 236 (2d Cir. 1936).

In making the favored transferee give up what he has received, the statute serves to conserve the estate of the insolvent so that each creditor can obtain the amount he would have received if "no preferential payments or transfers had been made and if the corporation's assets had been distributed to all its creditors in proportion to the respective amounts of their just claims." Newfield v. Ettlinger, 194 N.Y.S.2d 670, 674–675 (Sup.Ct.1959). The statute is not "penal * * * and by no possibility can it be so regarded; the transferee suffers no loss, but is put back where he was when insolvency occurred". Matters v. Manufacturer's Trust Co., infra 54 F.2d at 1016.

This remedy is but an application of the underlying principle of the statute, viz., that the assets of a corporation represent a trust fund for the benefit of creditors.[15] If every

---

15. The protection afforded extends to secured as well as to unsecured creditors. Globe Indemnity Co. v. Park-Lexington Corp., 154 Misc. 854, 277 N.Y.S. 407 (Sup. Ct.1935); Lane & Son v. Westchester County, 248 N.Y. 298, 162 N.E. 86 (1928); but see Barker v. 472 Fulton St. Corp., 24 N.Y.S.2d 570, modified on other grounds. 262 App.Div. 892, 28 N.Y.S.2d 941 (2d Dept. 1941).

creditor has been paid his proportional share, the trustee's action must fail, for while the statute declares that preferential transfers are "void," this is so only as to financially interested parties. Male v. National Pure Water Co., 176 Misc. 743, 27 N.Y.S.2d 984, aff'd 261 App.Div. 1050, 27 N.Y.S.2d 1023 (4th Dep't. 1941); Biscayne-Gallowhur Corp. v. Smith, 32 Misc.2d 304, 223 N.Y.S.2d 301, 303, modified 17 A.D.2d 930, 233 N.Y.S.2d 723, aff'd 14 N.Y.2d 629, 249 N.Y.S.2d 177 (1964).

■ The Referee in his decision of April 14, 1962 held that each of the two presently existing creditors of Anjopa, the Victory Paper Stock Company (hereinafter Victory) and the United States government, had a cause of action under Section 15, and the trustee succeeded to their rights. As an alternate ground for the trustee's attack, the Referee cited Hoffman v. Cream-O-Products, 180 F.2d 649 (2d Cir. 1950) interpretating subsection "c" of Section 70. *Hoffman* held that subsection conferred on the trustee the status of a hypothetical lien creditor under state law. It is unclear how this in itself helps the trustee. "The rights of creditors—whether they are existing or hypothetical—to which the trustee succeeds [under § 70(c)] are to be ascertained as of 'the date of bankruptcy,' not at an anterior point of time." Lewis v. Manufacturers Nat'l Bank, 364 U.S. 603, 607, 81 S.Ct. 347, 349, 5 L.Ed.2d 323 (1961). See F.D.I.C. Memorandum of Law, pp. 58–59. Invocation of Section 15 is not gained through use of Section 70(c), because a subsequent creditor, whether general or lien (one whose debt accrued after the transfers), cannot sue (although there are exceptions not here relevant).

### B. Victory's Standing

■ The Referee found that since Victory was an unpaid creditor at the time of the first transfer and remained so on the date of the filing of the petition, it could maintain an action against F.D.I.C. By stipulation dated March 1, 1960 the parties agreed that:

> Anjopa * * * was indebted to Victory * * * on December 20, 1956 in the amount of $2,837.20. On December 21, 1956 $500 was paid by the bankrupt to Victory on account thereof and on March 29, 1957 $500 was paid to Victory on account of such indebtedness, leaving a balance due to Victory on the date of bankruptcy of $1,837.20, which amount is still due Victory.

The Referee made no findings of the relative percentages received by Victory and F.D.I.C. It appears from the above that Victory obtained approximately 35% of its claim, whereas F.D.I.C. argues that it received less than 12%. Memorandum of Law, p. 22. In making its calculations F.D.I.C. accounted for the mortgage proceeds at a price much less than the Referee concluded it had received. Even were we to accept the Referee's figures for the moment, F.D.I.C. would still have received less proportionately on Anjopa's total indebtedness to them. Indeed, it might be argued that to the extent F.D.I.C.'s mortgage lien was valid under Section 15, the monies received in foreclosure thereof ought not to be included in such a calculation. In any event, F.D.I.C. did not receive a preference over Victory. This is so whether the time at which a preference is determined "is the time when one can look at the result of the bankruptcy * * *" or "the time when the payment of the alleged preference was made." Willcox v. Goess, 22 F. Supp. 841, 843 (S.D.N.Y.1938). Victory was in no wise entitled to full payment. "It would be inconsequent to hold that by means of a suit brought by one creditor against another, upon a statute intended to secure equality of distribution, the creditor suing could secure preference to himself and defeat the purpose of the statute." Lodi Chemical Co. v. National Lead Co., 41 App.Div. 535, 58 N.Y.S. 717, 720 (1st Dep't 1899).

### C. Standing of the United States Government

The only other creditor that the trustee relied upon was the United States. The Referee found that the government was a creditor of Anjopa at the pertinent times, and has not been fully paid on its tax claims. He concluded that the United States had standing to sue under Section 15.

Some confusion exists as to the nature of the tax claims and time of their assessment. Apparently there are two debts involved: (1) a claim in the amount of $213.66 for taxes due for the period ending March 31, 1952, and (2) taxes in the amount of $5,830.98 for the quarter ending December 31, 1956 upon which $3,917.60 was paid leaving a balance of $1,913.38. The $213.66 in unpaid taxes from 1952 was due on December 20, 1956 when the mortgage was given, but not the quarterly taxes for 1956. In their memorandum of law, page 61, F.D.I.C. had argued that contrary to Finding of Fact 34 "the United States Government was not a creditor of Anjopa for taxes on December 20, 1956."[16] In response thereto the trustee points to Government Ex. B as showing that the 1952 taxes were still due on December 20, 1956 and "a portion of that indebtedness was not liened until February 14 or 21, 1957." Memorandum of Law, p. 127. In their reply brief (p. 12) F.D.I.C. admits that the 1952 taxes were then due: "the unpaid taxes from 1952 in the amount of $213.66 were a lien on the Anjopa plant prior to the F.D.I.C. mortgage and were not affected by the creation of a subordinate lien." However, Government Ex. B does not mention the 1952 taxes.

The Referee in his memorandum decision (p. 7) believed that neither of the two tax claims had been liened prior to the transfers. He wrote:

The bankrupt owed F.O.A.B. taxes and withholding taxes as of the date of the transfers, although the lien for which, or a portion thereof, was not in fact filed until subsequent to the transfers. These taxes due at the time of the transfers were real and as to them the Government was an unsecured creditor.

On the other hand, Finding of Fact 34 says that the amount due on the 1956 employer's quarterly return, $1,913.38, was liened prior to the second transfer. In fact, Government Ex. C shows that a notice of federal tax lien for $1,913.38 was filed on April 16, 1957 in the Ulster County Clerk's office.

Anjopa's partial payment of its taxes is such that the government's percentage of recovery on its total claim appears to be greater than F.D.I.C.'s.[17] The fact that both Victory and the United States received partial payments on their claims is not discussed below. If the government were to be relegated to the status of the ordinary general creditor like Victory, the trustee would not have a cause of action. As will be discussed, we hold that the United States, despite its receipt of a greater percentage of its debt, can maintain a Section 15 action. But there is a dearth of authority on this issue, and for the further reason that there are factual uncertainties found in the record, we provide the following instructions for further proceedings.

With regard to the mortgages, it is not certain whether the 1952 taxes were unpaid on December 20, 1956. If they were not, then the trustee's action against

---

16. Finding 34 reads: "The United States Government was a creditor of Anjopa for taxes at the time of the first transfer to F.D.I.C. on December 20, 1956, herein held to be preferential, which said claim was unpaid at the time of the second transfer of July, 1957, likewise held to have been preferential, and which claim remained unpaid at bankruptcy. The

claim of the United States Government for the quarter ending December 31, 1956 was not liened until February 21, 1957 following the execution and delivery of the mortgages to F.D.I.C. on December 20, 1956."

17. The trustee does not argue that the claims are to be treated separately, to wit, that there was nothing recovered on the 1952 claim.

this transfer (the amount of the mortgage lien above $417,000) [18] must fail. If the taxes were due and were also liened (and remain unpaid), the Referee should determine: (1) whether independent of Section 15 the subordination of F.D.I.C.'s mortgages to the tax lien could *pro tanto* avoid the transfer so that the trustee under the rule of Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) would have a valid claim pursuant to Section 70(e) for the full extent of the transfer; (2) whether under Section 15 the government's lien entitled it to full payment on the debt as opposed to pro rata according to the damage rule in Hewlett Park Co. v. 1193–1205 East Broadway of Hewlett, Inc., supra; Brown Packing Co. v. Lewis, 185 Misc. 445, 58 N.Y.S.2d 443, 451 (Sup.Ct.1943).

Similarly, with regard to the transfer of accounts receivable in July 1957, a determination is essential on the following: (1) whether independent of Section 15 either the government's lien on the 1952 taxes, the 1956 taxes, or especially the notice of tax lien filed April 16, 1957 could enable it to avoid the transfer; (2) whether under Section 15 the government's notice of lien would bring it within the full payment rule above mentioned.

The issue now before us is whether the government as an unsecured creditor has standing to sue. In essence, our reason for so holding is that the United States unlike Victory would be a "priority" creditor upon the liquidation of the corporation in state insolvency proceedings or bankruptcy. See generally 28 N.Y.Jur. Insolvency, §§ 40–41; 3 Collier, Bankruptcy, supra ¶¶ 64.02, 64.401. As such, it is entitled to full satisfaction from the unencumbered assets of the insolvent's estate before each general creditor received a pro rata share of the remainder if any.

■ Recognition of the nexus between the laws governing the distribution of an insolvent's estate and Section 15 provides a guide to interpretation. The contemplated scheme of distribution would be stymied were it not for anti-preference laws which could invalidate transfers prior to the insolvency proceedings or bankruptcy. It is obvious that absent these provisions, to borrow a phrase, "only tag ends and remnants of unencumbered assets would too often remain." 3 Collier, Bankruptcy, supra ¶ 60 at 744. Section 15, for example is not to be strictly construed, Caesar v. Bernard, 156 App.Div. 724, 141 N.Y.S. 659 (1st Dep't), aff'd 209 N.Y. 570, 103 N.E. 1122 (1913), and has a six year statute of limitations.

■ The touchstone of the preferential transfer is the "loss" sustained. The language of the cases is more or less uniform; that loss is the difference between what the plaintiff actually received and what he "would have received, had the corporation been wound up * * *." Doehler v. Real Estate Board of New York Bldg. Co., 150 Misc. 733, 270 N.Y.S. 386, 403 (Sup.Ct.1934); Newfield v. Ettlinger, supra. This the government did not receive. As a practical matter, the government will not be actually injured in most cases by such a transfer because it is favored in the official distribution *custodia legis,* but where, as here, there is a "no asset" estate, that is not the case. Admittedly, federal law at present does not require that the government be favored prior to the actual insolvency proceedings, United States v. Sullivan, 19 F.Supp. 695, 699–700 (W.D.N.Y.1937) or prior to bankruptcy (except the four month provision of Section 60).

Yet, if the express purpose of the state statute [19] is to be fulfilled and the tests thereunder followed, then the "loss" sustained by a "priority" creditor, be it

---

18. Since the valid part of the mortgage lien is in excess of the value of the secured property, discussion over the validity of the rest of the mortgage is mooted.

19. Arguably the right is not necessarily state created.

wage claimant, the State, or the United States, is not measured the same as the general creditor's. To otherwise permit would be to benefit, through the happenstance of a nonjudicially approved prior payment, the general creditor at the expense of the priority creditor. So viewed, we think that the state would have permitted the United States to maintain an action here.

This conclusion is fortified by the similar construction given to Section 60 of the Bankruptcy Act. Section 60 provides that a preference will be effected when a transferee-creditor has been enabled "to obtain a greater percentage of his debt than some other creditor of the same class." This provision has not been literally applied so that prior to bankruptcy a potential priority creditor like the government would be lumped into the same class as a general creditor. Rather, the test has been whether the transferee received a "greater percentage of his debt that he would be entitled to under the distributive provisions of the Act." 3 Collier, Bankruptcy, supra, ¶ 60.34 at 902.[20]

Having found that Section 15 is applicable and that the trustee has standing, we now determine F.D.I.C.'s assertion that it has not violated that section.

### F.D.I.C.'s CLAIM: SECTION 15 IS NOT VIOLATED

#### A. Equitable Lien and Tracing

■ F.D.I.C.'s first argument is that "the mortgages which F.D.I.C. as Receiver obtained from Anjopa were free of attack under Section 15 * * because they confirmed a pre-existing equitable lien in favor of Home Bank under the doctrine of trust *ex maleficio*" Memorandum of Law, pp. 27–35. Such

an equitable lien is claimed to the extent of $417,000 which monies were drawn on the Bank and used in the capital expansion of the Anjopa plant. Both parties agree with the Referee (Decision of April 14, 1962, p. 6) that "'where a person wrongfully uses money of another in making improvements upon property owned by the wrongdoer, the owner of the money is entitled to follow it into the property so improved.'" IV Scott, Trusts § 512 (1956 ed.) (hereinafter Scott). If, as claimed here, there was a valid equitable lien on the property, a mortgage confirming the prior lien (to the extent thereof) would not be a prohibited transfer under Section 15, Paulding v. Chrome Steel Co., 94 N.Y. 334 (1884); Gay v. Hudson River Electric Power Co., 190 F. 773 (N.D. N.Y.1911); cf. Mulhern v. Albin, 163 F.2d 41 (8 Cir. 1947), and unless invalidated by some express provision of the Bankruptcy Act, a mortgage which created a valid lien under local law is not affected by the debtor's bankruptcy. Even in absence of a valid mortgage the trustee would take the property subject to the rights of an equitable lienor or trust beneficiary.

The Referee found (Decision of April 14, pp. 6–7) that:

During the period from approximately 1952, that being the time of the first overdraft, through 1956, the Bankrupt did sales of about $800,000 to $900,000 yearly; and that the receipt of such sales was deposited in its accounts in the Home National Bank. The Bankrupt was permitted at will to draw against these accounts, and was permitted to overdraw its accounts. It was not required to, nor did it, employ the funds either from deposits from sales or overdrafts, in any

---

**20.** Such decisions are persuasive, but by no means controlling of the instant issue. In looking to bankruptcy law we are mindful of the fact that New York courts are often guided by these decisions in deciding issues under the Debtor and Creditor Law. McKinney's Consol.Laws, c. 12,

Benefit of Assignment for In re General Creditors of M. S. Ackerman, Inc., 19 Misc.2d 260, 186 N.Y.S.2d 406, 408 (Sup. Ct.1959), and on occasion bankruptcy law has been looked to in applying Section 15. MacIntyre v. State Bank of Albany, 307 N.Y. 630, 120 N.E.2d 832 (1954).

particular manner. The funds overdrawn created an indebtedness from it to the bank. That the overdrawing was illegal does not change the situation. The Bankrupt was a debtor and the bank its creditor. There was no trustee-cestue relationship.

We disagree with the Referee's characterization of the relationship between Anjopa and the Bank as merely that of debtor-creditor.[21]

A so called "trust *ex maleficio*," though not technically a trust, Rice v. Braden, 243 Pa. 141, 89 A. 877, 880 (Sup.Ct.1914), is used in describing a "constructive trust." Constructive trusts are also called *"ex delicti,"* "involuntary trusts," or "trusts *in invitum.*" Bogert, Trusts § 77 (1963 ed.). A constructive trust arises when a person holding title to property is subject to an "equitable duty to convey it to another on the ground that [he] would be unjustly enriched if [he] were permitted to retain it." Scott, § 462.1.[22] "The courts will compel one who obtains land, personal property or money from another by means of fraud * * * to

hold the property as though he were a trustee of an express trust. * * * While express trusts are fiduciary relationships, a constructive trust need not have its origin in such a bond." Brown v. New York Ins. Co., 58 F.Supp. 252 (D.Or.1944), aff'd 152 F.2d 246 (9 Cir. 1945). Thus, for purposes of establishing a constructive trust it is immaterial that prior to Anjopa's overdrafts Di Candia was not a fiduciary of the Bank. See, e. g., St. Louis & San Francisco R. R. Co. v. Spiller, 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060 (1927); In Re Pacat Finance Corp. 27 F.2d 810 (2 Cir. 1928); Scott, § 515 at 3287;[23] see also Bogert, Trusts § 926 n. 93.

Furthermore, the fact that normally the relationship of bank to depositor is that of debtor to creditor is not controlling (for example see Brennen v. Tillinghast, supra), nor is it material that Bank funds were misappropriated by fraudulently crediting Anjopa's account instead of by depositing stolen cash. Cash and such credits are fungible. See Bogert, supra § 924. The Bank's rights with respect to recovery

21. As noted, the Directors of the Bank had not granted Rose permission to make loans to Di Candia. Both men were guilty of misappropriating national bank funds.

22. An "equitable lien" differs from a constructive trust; the former is a security interest in the property. "Thus, where a person [the Bank] makes improvements upon the property of another as a result of fraud or mistake of such character that he is entitled to restitution, he can enforce an equitable lien upon the property to secure his right to restitution, but he cannot enforce a constructive trust on the property" itself. Scott, § 463; see also §§ 472, 512. To accomplish the latter, money received as a result of fraud would have to be used in the purchase of the property. See Cherno v. Dutch American Mercantile Corp., 353 F.2d 147, 153 (2d Cir. 1965). F.D.I.C. claims a "constructive trust" with regard to some of the Bank funds, since it is alleged, contrary to the finding of the Referee, that approximately $48,000 went into the very purchase of the plant (see F.D.I.C.'s pro-

posed findings of fact No. 5) in contrast to the purchase of improvements. Whether the claim to the mortgages is predicated on a constructive trust theory or that of equitable lien, the burden of proof with respect to tracing is the same. If there has been a diminution in the value of the property and if a party has a choice to claim either an equitable lien or a constructive trust, the former provides the best means of redress. See Scott, § 516.

23. "[I]t is immaterial whether the wrongdoer is a fiduciary or not. There is no reason why any person whose money has been wrongfully taken by another and mingled with his own should not be entitled to charge upon the mingled fund. There is no reason why the general creditors of the wrongdoer should be entitled to profit where he has obtained money by fraud or has misappropriated money, even though he was not in a fiduciary relation to the person whose money he took * * *. The creditors of the wrongdoer cannot object to this. Since they are not purchasers for value, they stand no better than their debtor."

should be no different here than would be the case if Di Candia received cash from the Bank's vault and deposited it in a different bank.

■ The rule is that once the trust relationship has been established, which we so find, one claiming as a cestui que trust thereunder must identify the trust fund, and if it is mingled, he has the burden of tracing it in original or substituted form. Sonnenschein v. Reliance Ins. Co., 353 F.2d 935 (2d Cir. 1965).[24] The Referee held that F.D.I.C. had failed to meet their burden of tracing (Decision of April 14, p. 7): "since thousands of dollars from sales were mingled with overdrafts during 1952 through 1956 and it was not established whether bank overdrafts or sales proceeds were employed in the acquisition of property, or any specific property."

F.D.I.C. makes two arguments in answer to this finding: (1) "sales and overdrafts are two different things, which could not be mingled, and were not." and (2) Bank funds had to be employed in the acquisition of property since sales merely reduced overdrafts, and absent Bank funds Anjopa would not have had a credit balance against which it could draw. Memorandum of Law, pp. 29–30. We find for F.D.I.C. on this issue, but for reasons other than advanced by it. [25]

■ The equitable lien which attaches to Bank funds is not necessarily defeated by its commingling with Di Candia's other funds. As the Court said in

Estate of Liebman, 189 Misc. 282, 60 N.Y.S.2d 482, 484 (Surr.Ct.1945):

It is a principle well established that the mere fact that a claimant's money is mingled with money of the wrongdoer does not preclude the claimant from tracing his money into the mingled fund and enforcing an equitable lien upon it. Where a person who is a conscious wrongdoer mingles money of the claimant with money of his own and thereafter withdraws and dissipates a part of the mingled fund, the claimant is entitled to enforce an equitable lien upon the part of the fund which remains. Where the wrongdoer is insolvent, the claimant is entitled to priority over the general creditors of the wrongdoer in collecting his claim out of the balance of the fund. [4] Scott on Trusts, vol. 3, §§ 515, 517; Restatement of the Law on Restitution, Chap. 13, §§ 209, 210 and 211.

As against the insolvent trustee's general creditors, the trust beneficiary is entitled to a lien against the mixed bank account to the full extent of the trust monies even if the fund, having been partially dissipated, has a lower ending balance. The Restatement of Restitution cited by the Court in *Liebman* makes clear that, contrary to the Referee's holding, this is so even though it is impossible to determine whose funds, the trustee's or the beneficiary's, were dissipated from the mixed fund. Restatement, Restitution § 211 Comment

---

24. The parties do not argue the question of which law is controlling, state or federal. The determination of the trust relationship is governed by state law. However, "whether state or federal law governs the extent to which a trust beneficiary must identify trust property has not been authoritatively settled." Sonnenschein v. Reliance Ins. Co., supra at 937 n. 2. See 4 Collier, Bankruptcy ¶ 70.25[2] at 1222–25 (14 ed. 1964).

25. Considering F.D.I.C.'s arguments, first, there is no authority for the proposition that overdrafts could not be co-mingled with the constructive trustee's own de-posits coming from sales. The net effect on the Bank's accounting is the same whether Anjopa overdrew on fictitious credits or through a roundabout procedure of first making deposits of the Bank's cash from its vault. As indicated, for purposes of tracing such credits and cash are treated as fungible. Second, the fact that Anjopa undoubtedly would have made the same amount of withdrawals *but for* the Bank's misappropriation does not answer the question of whose funds were used for what. It is impossible for F.D.I.C. to answer this question, although, as will be seen, the question is immaterial.

b., illustration 1,[26] Restatement 2d, Trusts § 202i; Bogert, Trusts § 928; Scott, § 517 at 3296.[27]

In the instant case there were no monies left in the Bank upon which F.D. I.C. could exercise its lien. From 1952 to 1956 most of the monies from the mixed fund in the Bank were used for general operating expenses,[28] and some for capital acquisitions and improvements. With respect to the latter, F.D. I.C. produced Anjopa's cancelled checks drawn on the mingled fund, showing that approximately $417,000 went into certain identifiable property. "Where money of the claimant is mingled with money of the wrongdoer and the mingled fund is used in acquiring other property, the claimant is entitled to follow his money into the property thus acquired." Scott, § 516 at 3289. In Schuyler v. Littlefield, 232 U.S. 707, 710, 712–713, 34 S.Ct. 466, 58 L.Ed. 806 (1914) recovery would have been allowed if

checks drawn on the mixed account were shown to have been used in acquiring property.

The principles applicable to following the stolen funds into the mixed or mingled fund are equally applicable in tracing those funds from the mixed fund into the improvements to the property acquired therefrom.[29] See note 27 supra; Scott, §§ 517, 517.1 and 521 at 3326; Restatement, Restitution § 211; Restatement 2d, Trusts § 202i. The following illustration (number 19) provided by the Restatement of Trusts is especially pertinent:

A is a trustee for B of $1,000. He deposits his money in his individual account in a bank where he has $1,000 of his own on deposit. He draws out $500 with which he buys securities, and subsequently draws out the balance of $1,500 which he dissipates. B is entitled * * * to an equitable lien upon the securities for $1,000.

26. "b. Where part withdrawn is dissipated. If a wrongdoer deposits in a single account in a bank money belonging to another and money belonging to himself, and subsequently withdraws and dissipates a part of the deposit, the claimant is entitled to an equitable lien on the balance of the account, or if the balance is subsequently withdrawn, upon its product if it can be traced * * *.
Illustrations: (1) A has $1,000 of his own on deposit in a bank. He deposits in the same account $1,000 wrongfully obtained from B. He draws out $1,500 which he dissipates. B is entitled to an equitable lien for $1,000 upon the balance of the deposit. (2) * * * *"

27. Professor Scott sets forth the best rationale of the rule. "If the balance is less than the amount of his claim, he is entitled to the whole of the balance, and for the remainder of his claim he can come in as a general creditor of the wrongdoer. The claimant has an equitable lien upon the mingled fund, and when a part of the fund is withdrawn he has an equitable lien on the part withdrawn and on the part which remains. If the part which is withdrawn is dissipated so that it can no longer be traced, the claimant has his equitable lien on the part which remains. So also * * * if the part which is withdrawn is preserved and the part which remains is subsequently dissipated,

the claimant has an equitable lien upon the part which is withdrawn. It is impossible and unnecessary to determine whether the claimant's money is included in the part withdrawn or in the part which remains. It is impossible to determine which part is the claimant's money, since his money has been so commingled as to lose identity. It is unnecessary to determine which part is the claimant's money since he is entitled to an equitable lien upon both parts."

28. F.D.I.C. failed to trace these funds, for although some of the Bank's money was probably used to pay these expenses (see Tr. 883), it did not produce any property which was a "substitute for, or product of, the trust funds which were misappropriated." Bogert, supra § 922; Scott, § 521 at 3324–25. "Tr" followed by a number refers to the official transcript in evidence.

29. It might well be argued that the beneficiary claimant ought only to be entitled to a lien on the property in proportion to the amount of the trust money in the mixed account at the time of its purchase. See Bogert, supra § 928 n. 18. But just as full recovery, as opposed to proportional, is permitted against the bank balance of a partially dissipated mixed fund (note 26 supra), full recovery is allowed against the remainder of the mixed fund which has gone into the property.

We conclude that F.D.I.C. has shown that they were entitled to an equitable lien on the Anjopa plant. To the extent that the mortgage confirmed an equitable lien for approximately $417,000 it is not an invalid transfer within the ambit of Section 15.[30] As to the Bank monies not traced, the validity of the mortgage securing that part of Anjopa's antecedent debt is considered in the next section.

### B. Continuation of the Business

F.D.I.C. further argues that Section 15 was not violated because "both F.D.I.C. as Receiver, and Anjopa, anticipated that Anjopa would continue in business after giving the mortgage[s]." Memorandum of Law, pp. 35-41. The test under Section 15 is whether the mortgages were given "in contemplation of insolvency and winding-up as an impending fact" or, as F.D.I.C. claims, "in contemplation of continuing business in good faith. And this question must be determined * * * as an inference from the surrounding facts." Cardozo v. Brooklyn Trust Co., (E.D.N.Y.), aff'd on the opinion below and reported at 228 F. 333, 334 (2d Cir. 1915).

We find that the record amply supports the Referee's decision that the mortgages were given and received not in the belief, surrounded by good faith, of Anjopa's continuance in business, but with intent to give F.D.I.C. a preference over other creditors. Findings of Fact, 37-40.

The trustee must prove four elements under Section 15 in order to recover:

insolvency existed or was imminent at the time when the transfers or payments were made; that the transfers or payments resulted in a preference; that the transferee at the time of the transfers or payments were received had notice or reasonable cause to believe that the transfers would effect a preference; and that an intent existed on the part of the insolvent to give a preference to the transferee. Haberman v. Larens Corp., 35 N.Y.S. 2d 533, 535 (Sup.Ct.1942); Irving Trust Co. v. Chase Nat'l Bank, 72 F.2d 668 (2d Cir. 1934).

It is beyond doubt that on December 20, 1956 Anjopa, then faced for the first time with the burden of repaying the Bank, was hopelessly insolvent. Insolvency in this context means that the debtor is unable to meet his obligations as they fall due in the ordinary course of business. E. g., Bielaski v. National City Bank of New York, 58 F.2d 657 (S. D.N.Y.1932), aff'd 68 F.2d 723 (2d Cir. 1934); In re Schulte Retail Stores Corp., 22 F.Supp. 612 (S.D.N.Y.1937); Irving Trust Co. v. Chase Nat'l Bank, supra.

On December 7, 1956, F.D.I.C. officials met with Di Candia and his accountant, Jerome Margolies. They were given Anjopa's October 31, 1956 trial balance (Trustee's Ex. 14) and were informed that the June overdraft figure of $899,122 had increased to $926,510 as of October 31, 1956. From various sources of information including Di Candia's accountant and attorney, the FBI, the trial balance, and from Di Candia himself, F.D.I.C. had actual notice (see, for example, Trustee's Ex. 20) that (Decision of April 14, 1962, p. 3): "the Bankrupt owed approximately $1,200,000 against quick assets of about $332,000 * * *."

The trustee points out that if the inventory were added to these assets, there would still be a deficiency of $773,059. Trustee's Memorandum of Law, p. 26; see Findings of Fact 13 and 14. But F.D.I.C. objects to this conclusion, because it would exclude the indebtedness to the Bank in determining under the insolvency test whether Anjopa could meet its obligation See Proposed Finding of Fact 19. There is no authority for this position, nor is there any reason to distinguish between the debt to the Bank, albeit the largest, and the debts of the other creditors.

---

30. Findings of Fact 42 as well as Conclusion of Law 17 with respect to the invalidity of the mortgages is incorrect.

However, notwithstanding the fact that the debtor is insolvent, the payment of an antecedent debt for the benefit of one creditor to the detriment of another does not in itself violate the statute. Cardozo v. Brooklyn Trust Co., supra. For a violation to be made out the intent to prefer must be proved as a separate fact. Doyle v. Gordon, 158 N.Y.S. 248, 258 (Sup.Ct.1954). Both transferee and transferor must believe at the time of the act that the transfer is preferential Such knowledge will be charged or imputed to the debtor and/or the creditor when the payment is made in contemplation of winding-up or when bankruptcy "was at least the natural, probable and only foreseeable end." Dalziel v. Rosenfield, supra, 265 N.Y. at 80, 191 N.E. at 842; Margolis v. Gem Factors Corp., 201 F.2d 803, 805 (2d Cir. 1953). On the other hand, a transfer made with a view to keep the company in business and eventually liquidate all debts does not violate the statute. Bielaski v. National City Bank of New York, supra 58 F.2d at 660.

F.D.I.C. argues that there is not a scintilla of evidence in the record that at the time the mortgages were given Di Candia or the F.D.I.C. had the specific intention to wind-up Anjopa's business. Memorandum of Law, p. 12. To buttress its position, F.D.I.C. points to information it received from Di Candia and which it relied upon as Anjopa's good prospects for overcoming its insolvency if it were permitted to continue in business. Di Candia claimed that the plant was worth $1,000,000, and that he refused an actual offer of $500,000. Furthermore, the plant was said to be earning $20,000 a month since the fall of 1956 after certain improvements had been made. The F.D.I.C. reasoned (Memorandum of Law, p. 12):

If the plant was actually worth anything like the value Di Candia claimed for it, there might be assets enough to repay the overdraft. Of course the Receiver did not know whether he was telling the truth. However, the important thing was that he appeared in no immediate danger from his creditors. [Di Candia said that he thought he could "control" them.] F.D.I.C. * * * decided to let him continue to operate the plant, and agreed that Anjopa could use its accounts receivable and inventory to obtain financing for continued operations.

On December 20, 1956 mortgages were given on every physical asset owned by the bankrupt; inventory and accounts receivable were not encumbered. As Di Candia saw it, there was little choice: unless the mortgages were given, he would be faced with receivership or bankruptcy. Finding of Fact 17; Tr. 544–545. His preferential intent is evidenced in part by his testimony, excerpts of which follow (Tr. 882–885):

Q. Did you tell the F.D.I.C. you were reluctant to give them the mortgage?

A. Yes.

Q. What did you tell them?

A. I said—'oh, this is fine, everybody comes around, I owe them money. You want a mortgage. We have a lot of money in here which we are supposed to be working with. Mr. Rose is in jail and how am I supposed to operate?' * * *.

* * * * * *

Q. When you gave the F.D.I.C. the mortgage in December 1956, you gave them a mortgage on all the property of Anjopa; didn't you?

A. That's right.

* * * * * *

Q. So that there were no other assets for any other creditors except what you could earn out of profit?

A. Yes.

Q. In that respect, weren't you giving the F.D.I.C. a better status than other creditors.

A. It is true—but the F.D.I.C. represented a branch of the government * * *. They knock

you out of the box, while my other people I could talk to.

Q. The fact remains that when you gave * * * the mortgages in 1956, you left yourself nothing else for other creditors?

A. I left nothing else for myself.

Q. That is true; isn't it?

A. That's right.

Q. In that situation, you were preferring the F.D.I.C. over other creditors; weren't you?
[Referee overrules objection]

A. Yes, I think I was.

\* \* \* \* \* \*

On cross-examination however Di Candia acknowledged that he "anticipated" that Anjopa would be able to continue in business. Tr. 901. This statement may appear to be inconsistent with his prior admission of preferring F.D. I.C. In evaluating the statement, the test is not what Di Candia would have liked to happen as asserted above, but whether he actually believed it was likely. Even assuming *arguendo* that the statement is tantamount to an assertion of actual belief as opposed to wishful thinking or mere "puffing," in view of Anjopa's bleak prospects (as will be discussed) it cannot be taken at face value, and the Referee could have chosen to disbelieve him.

 What emerges from the entire record is the picture of Di Candia, cut off from Bank funds and subject to a possible jail sentence, nurturing the bare hope that Anjopa would continue in business. A bare hope is an insufficient defense to giving a preference. Without more, and given a condition of insolvency, there is reasonable cause to believe the transfer will effect a preference. The transferor need not intend to profit himself, Globe Indem. Co. v. Park-Lexington Corp., 154 Misc. 854, 277 N.Y. S. 407 (Sup.Ct.1935), nor is the intent to prefer rebutted by the transferor also having another motive. "When the debtor pays one of his creditors at a time of financial stress, with the hope that the storm will be weathered but, in

any event, with the purpose of seeing to it that that particular creditor is paid if the worst happen * * * then the intent to prefer is present." Van Schaick v. Title Guarantee & Trust Co., 252 App.Div. 188, 297 N.Y.S. 827, 843 (2d Dep't 1939); Baker v. Emerson, 4 App.Div. 348, 38 N.Y.S. 576, 579 (3d Dep't 1896); Doyle v. Gordon, supra.

The language in the *Van Schaick* case is equally applicable in evaluating the creditor's intent. Perhaps Judge Learned Hand put it best when he said colorfully:

It is still a preference if a debtor, knowing that he is insolvent, selects one creditor, though he believes that he may not go to the wall, if the dice fall right. He must actually believe that the gods will smile; it is not enough that their faces are inscrutable. Matters v. Manufacturer's Trust Co., 54 F.2d 1010, 1014 (2d Cir. 1931).

It is clear that F.D.I.C. did not know what the result of the operations would be. That the plant "might be losing money" was one of the reasons that F.D. I.C. was eager to obtain the mortgages as quickly as possible. Tr. 70. F.D.I.C. officials did not testify that they thought Di Candia was necessarily telling the truth; they appear to have had some reservations founded in suspicion. With the mortgages in hand and Di Candia keeping his creditors in line, "the best way to find out whether the plant could operate profitably was to continue it in operation and observe the results, which was what the Receiver decided to do." F.D.I.C. Memorandum of Law, p. 15. Unlike the finding in Todarelli v. Visigraph Typewriter Mfg. Co., 34 F.Supp. 762, 765 (S.D.N.Y.1940), cited by F.D.I.C., Di Candia's statements at best did not engender within F.D.I.C. officials the actual belief that the "gods will smile." Section 15 does not permit less.

Indeed, in view of the information the F.D.I.C. had, his statements at best were worthy of slight weight. What follows was known to the F.D.I.C. Findings of Fact 37–40. The Referee found: ab-

sent Bank funds, Anjopa could not have remained in business (No. 12); the overdraft had jumped $27,388 from June 30, 1956 to October 31, 1956 (No. 11); there was a tremendous deficit, the deficiency of liquid assets to meet current liabilities was at least $773,059 (No. 13); Anjopa was also insolvent in the bankruptcy sense, total assets being less than total liabilities (No. 14); Di Candia and Rose faced criminal charges for their manipulations and misappropriations of Bank funds (Nos. 6–8). The likelihood or possibility of Di Candia being incarcerated presented a grave threat to Anjopa's existence, since he was the prime mover in the plant's operations, and small likelihood of any one to take his place should this contingency arise. Further, despite free use of the large Bank overdrafts for several years, Anjopa showed an impairment of its capital account in the sum of $349,176 on its October 31, 1956 trial balance (Trustee's Ex. 14) which is indicative, even if its books were not altogether accurate, that the plant was not profitable.[31] Moreover, with regard to Di Candia's credibility and motives, as the Trustee suggests, "having been caught redhanded, Di Candia had no alternative other than to cooperate." Memorandum of Law, p. 49. In sum, Anjopa had a tremendous deficit to make up; its working capital was meager since it no longer had access to Bank funds; it faced closing down if Di Candia went to jail; and its past operations had not been successful.[32] Thus, "if the gods did not actually frown, their faces were at least inscrutable." Dalziel v. Rosenfield, supra, 265 N.Y. at 80, 191 N.E. at 842.

C. Creditor Approval of the Mortgages and Compromise Agreement

F.D.I.C. makes four arguments under this subheading. First, "Anjopa's creditors were informed by the Receiver, prior to the end of the four-month period for setting aside preferences under the Bankruptcy Act. If they had thought that Anjopa's situation was hopeless, they had opportunity to attack the mortgages, but they chose not to." Memorandum of Law, p. 41.

However, the failure of the other creditors to attack the mortgages under Section 60 may be due to several reasons, each unrelated to whether they thought Anjopa's prospects were "hopeless": (1) insufficient time to organize such a suit; (2) their belief in the validity of F.D.I.C.'s trustee *ex maleficio* theory; (3) their belief that they would get a better return if Anjopa were not put in bankruptcy at that time. In addition, what is at issue here is the intent of Di Candia and the F.D.I.C., not that of other creditors. Moreover, belief in "hopelessness" is not the *sine qua non* of preferential intent.

Second, the 90% of the creditors who approved the compromise agreement on July 12, 1957 gave Anjopa a "vote of confidence in * * * [its] ability to continue in business * * *." Memorandum of Law, p. 42. Similarly, creditor approval of the compromise agreement does not necessarily represent a vote

---

31. Prior to December 20th, the FBI told F.D.I.C. that Di Candia had lost money in a similar business in Pennsylvania, a situation in which bad check charges may have also been involved. Tr. 354–56.

32. In addition to the above information, the Referee charged F.D.I.C. with constructive notice of facts which "a reasonably diligent inquiry would have disclosed." Conclusion of Law, 5. Margolis v. Gem Factors Corp., 201 F.2d 803, 805 (2d Cir. 1953). Knowing what F.D.I.C. did of Anjopa's "machinations," it had the obligation of further inquiry. In re Hygrade Envelope Corp., 366 F.2d 584,

588 (2d Cir. 1966). Here, examination of Anjopa's books would have revealed its high yearly losses, particularly $142,792 for the year ending June 30, 1956, and inquiry of the FBI would have given the F.D.I.C. more detailed information as to Di Candia's unfavorable business background (see note 31, supra) and his questionable expenditures while managing Anjopa. See Trustee's Ex. 69. The Referee found, contrary to F.D.I.C.'s argument, that Anjopa's books were not unavailable for inspection. Finding of Fact, 15. Even without this notice though, F.D.I.C.'s intent was preferential.

of confidence. At that time, they could either have approved the agreement or watch Anjopa go into bankruptcy, and in choosing the former their desideratum was in receiving the greatest percentage of recovery on the dollar. Again, the issue here with respect to the transfer of the notes is the intent of the F.D.I.C., and this will be discussed in connection with the argument below.

Third, F.D.I.C. argues that the compromise agreement "was a step intended to permit Anjopa to continue in business," and thus, Section 15 was not violated. Memorandum of Law, p. 43. We disagree.

F.D.I.C.'s interest in the compromise agreement which was to be initiated by the creditor's committee was, as they wrote to the committee, "to enable the collection of a greater portion of the indebtedness [owed to it] than can be accomplished by maintaining * * * [F.D.I.C.'s] present status as a secured creditor * * *. The corporation does not have any plan for the continued operation of the business, nor does it believe that it should initiate any such program." Trustee's Ex. 26. In mid-May the creditors offered $200,000 in settlement or, in lieu thereof, a long term fifteen year plan for the payment of Anjopa's entire indebtedness, other creditors being expected to be made whole after four years. In an interoffice memorandum dated May 17, 1957 (Trustee's Ex. 30) an F.D.I.C. official succinctly diagnosed Anjopa's prospects as then seen: "We would not give this [the long term plan] serious consideration for the reason that Di Candia is losing money, needs many thousands of dollars to rehabilitate the plant, and we are confident that without help the business will soon collapse." It almost goes without saying that this plan was rejected. F.D.I.C. began to press the creditors for an agreement since they were, among other things, "alarmed at the apparent dissipation of assets which * * * [had] occurred since the first of the year.[33]

Anjopa's financial condition had deteriorated since December 1956 when the mortgages were given. In brief, F.D.I.C. knew, or should have known, by then that: (1) the company was not making $20,000 a month as Di Candia had claimed, but was in fact "losing money rapidly" (Trustee's Ex. 30); (2) the loss for the year ending June 30, 1957 was $301,786 (Finding of Fact 6); (3) Di Candia was, by then, under indictment; (4) the FBI investigatory reports contained derogatory information about Di Candia; (5) the plant was appraised at $300,000 as a going concern (Trustee's Ex. 12), a figure less than expected.[34]

By the compromise agreement F.D.I.C. settled its claim for $300,000. Pursuant to the agreement, F.D.I.C. received $100,000 in third-party notes representing some of Anjopa's accounts receivable; the remainder was to be paid in four semi-annual installments of $50,000 commencing in July 1958 and bearing 5% interest. The risk F.D.I.C. incurred appears to be minimal, for their mortgages according to the agreement would "remain in full force" (Provision VII) until Anjopa met all the payments. Overbalancing the risk of Anjopa's further decline and the possible diminution of its value upon foreclosure was the advantage to F.D.I.C. of immediately scooping up $100,000 in accounts receivable. F.D.I.C. saw to it that it was paid and protected in case the "storm" was not

---

33. Telephone conversation of May 22, 1957 between F.D.I.C. and a member of the creditor's committee. Trustee's Ex. 49.

34. All of this information was also known to Di Candia. His intent was preferential as was F.D.I.C.'s. In addition, Di Candia testified as follows (Tr. 889):
 Q. You were treating F.D.I.C. better in July 1957 than you were treating your other creditors?
 A. If you want to put it that way, yes.
 Q. How do you put it?
 A. They would foreclose if I didn't make an agreement with them and pay them, where the other people would not do that.
 THE REFEREE: That was because of the mortgage executed in December, 1956?
 A. That's right.

"weathered." Van Schaick v. Title Guarantee & Trust Co., supra.

F.D.I.C. argues, though, that with the debt scaled down Anjopa could continue. There is competent evidence to the contrary. See Tr. 1081–87. The trustee's witness, Leon I. Radin, a certified public accountant, testified that notwithstanding the scaling down he considered Anjopa's prospects for continuation in business "hopeless." Tr. 1087.

■ At the very best, F.D.I.C. was no more optimistic over Anjopa's future than they were on December 20, 1956. Accordingly, we find that in receiving the notes they acted with preferential intent. Matters v. Manufacturer's Trust Co., supra; Dalziel v. Rosenfield, supra.

■ Fourth, and finally, F.D.I.C. argues that the Referee should have given weight to the fact that the agreement "was approved by an order [filed August 1, 1957] of the Supreme Court of the State of New York as contemplated by the National Banking Act." Trustee's Ex. 11; Memorandum of Law, p. 42. The order signed by the New York Supreme Court was *ex parte*, and its underlying petition did not raise for that Court's determination questions which are the subject of the instant review. No *res judicata* effect can be given to its order.

D. Partial Payment to other Creditors

F.D.I.C.'s last argument that it did not violate Section 15 is that since other creditors as a group received a greater proportion of their debts than the Receiver, it was not preferred. Memorandum of Law, pp. 43–45. Here, other creditors as a whole allegedly received $50,000 in partial payment of an indebtedness to them of about $240,000, whereas F.D.I.C. recovered only $95,000 on the notes plus $38,000 on the mortgages or less than 12% of its claim against Anjopa.

■ F.D.I.C. argues that an individual creditor who received proportionately less than F.D.I.C. would have no cause of action against it. However, the statute interdicts against one creditor being preferred or favored over another. The fact that other transferees (or another transferee) may have been more favored than F.D.I.C. does not entitle it to any right, vis-a-vis a particular creditor, to a greater pro rata share of Anjopa's assets. The cases relied upon by F.D.I.C. such as Pennsylvania R. Co. v. Peddrick, 234 F. 781 (N.D.N.Y.1916); Trustees of Masonic Hall & Asylum Fund v. Fontana, 99 Misc. 497, 164 N.Y.S. 370 (1st Dep't. 1917); Shaw v. Jewel Radio Corp., 6 A.D.2d 707, 174 N.Y.S.2d 315 (2d Dep't. 1958) do not sustain its argument.

■ We therefore conclude that the transfer of the notes in 1957 was a preference entirely recoverable by the trustee; that the mortgage in 1956 was preferential only in being in excess of $417,-000.

AMOUNT RECOVERABLE BY
THE TRUSTEE

F.D.I.C. alleges several errors with respect to the Referee's Order of November 4, 1964 requiring payment of some $288,-702 with interest. Memorandum of Law, pp. 62–71. This amount represents the net proceeds of the notes of $95,000 plus the "value" of the mortgaged property (as opposed to the proceeds thereof) reflected by the selling price to American Paper.

■ We find as follows: (1) the trustee may only recover the proceeds of the notes and the uncollected notes receivable; (2) interest is to be payable on the proceeds from March 10, 1959, the date of the trustee's petition; (3) insofar as F.D.I.C. has received the proceeds of the mortgages, its claim against the bankrupt will be reduced by the net difference between such proceeds and the allowable credits.

We have determined that the F.D.I.C. held a valid mortgage lien to the extent of $417,000. That the lien was not valid to the extent of $800,000 is only academic, for in no view of the value of the liened property is it worth more than $417,000. Accordingly, the equity in the property not being worth more than the lien, the

property rightly belongs to F.D.I.C. See Federal Land Bank of Baltimore v. Kurtz, 70 F.2d 46 (4 Cir. 1934).

■ The parties are in disagreement over the value of the property. To begin with, F.D.I.C. contends that the trustee is estopped to recover its value because his petition, pursuant to Section 70(e), seeking to set aside the alleged preferences only asked for "the property or the proceeds thereof." This contention is without merit, because not only has F.D.I.C. not shown itself to be prejudiced, but the general prayer is sufficiently broad—the section expressly entitles the trustee to "reclaim and recover such property or collect its value * * *."

F.D.I.C. contends that the value of the property is best reflected by the public auction on March 2, 1959 at which F.D.I.C. purchased the property free of its lien, the judgment of foreclosure and sale being entered on the same day. F.D.I.C. bid $80,000, but after credits the purchase yielded a net reduction of Anjopa's debt of $38,503. There is no allegation that money was passed on this transaction, because evidently it would be needless for F.D.I.C. to pay the auctioneer what would only have to be paid back to it.

■ Prior to the sale, on June 19, 1958 Referee Schofield, upon petition, had authorized F.D.I.C. to foreclose its mortgage. The order provided:

that the granting of the said motion is and shall be without prejudice to any and all rights of the Trustee herein to commence any action or proceeding against the Federal Deposit Insurance Corporation, as Receiver aforesaid, in connection with the said mortgages or the proceeds thereof, and the Referee in Bankruptcy herein is granted summary jurisdiction to determine and adjudicate the rights of the Trustee and [F.D.I.C.], as Receiver aforesaid, in and to the said mortgages or the proceeds thereof * * *.

Allowing F.D.I.C. to foreclose at an "execution sale" as opposed to the Bankruptcy Court maintaining control over the property and selling at a "judicial sale," see In re Haywood Wagon Co., 219 F. 655, 657 (2d Cir. 1914); 4 Collier, Bankruptcy, supra ¶ 70.97[4], is proper where there is no probability that a sale under the trustee's auspices (free of liens) would result in an amount in excess of the lien for the benefit of general creditors. Federal Land Bank of Baltimore v. Kurtz, supra. Where the validity of the mortgages is questioned (such as here), then notwithstanding the fact that the lien as stated is greater than the appraised value of the property, the Referee in his discretion may order sale of the property free of incumbrances and subject to his control. In re Nat'l Grain Corporation, 9 F.2d 802 (2d Cir. 1926). We note in passing that had the property been subjected to the Bankruptcy Court's supervision under Section 70(f) providing for such controls as an appraisal of the property and the mandatory approval of the Court where the property is sold for less than 75% of its appraised value, the instant dispute would not have arisen. In any event, the trustee has not alleged any impropriety in this sale, nor does he seek to set aside the sale to F.D.I.C.

But the fact that the validity of the sale is not disputed does not establish the fact that the property was worth $38,503 or even $80,000. While no official appraisal under Section 70(f) was taken, F.D.I.C.'s own appraiser in March 1957 concluded that the property was worth around $300,000 as an "operating plant" and $200,000 as a "closed plant." Trustee's Ex. 12. In addition, in filing its proof of claim against the bankrupt estate F.D.I.C. valued the security held by it at $220,000. Finding of Fact 29. Had this been a proceeding to confirm a sale, this gross disparity in prices would prevent confirmation, see Matter of Burr Manufacturing and Supply Co., 217 F. 16 (2d Cir. 1914), and though these contexts be different, we find no reason to approve a similar result by accepting the March 2, 1959 sale figures.

■ On the other hand, the Referee found that the sale to American Paper was the best evidence of value,

since it was "a negotiated, bona fide, legitimate sale, * * * and American was a bona fide purchaser for value." Findings of Fact 31, 33. We agree with this conclusion in part. If the bona fide sale to American Paper is a good indication of value, so too is the sale to Channel Master Corporation. The trustee argues that this latter transaction should not be taken into consideration, because neither the Bankruptcy Court nor the trustee was involved. Memorandum of Law, p. 143. In fact Referee Schofield on June 22, 1962 denied F.D.I.C.'s application to obtain his approval for the then pending sale to Channel Master for the reason that the Court had lost control of the property on June 19, 1958 (when the order permitting foreclosure was signed). Yet, the non-involvement of the trustee and the Referee was equally true with respect to the sale to American Paper. F.D.I.C. officials appear to have been diligent in seeking buyers for the property. The trustee neither alleges that F.D.I.C. was negligent in obtaining this sale, nor asserts that the trustee's efforts could have garnered a higher price. "Where the defendant has realized on the property and has obtained for it as much as the trustee could have obtained, he is chargeable only for the net proceeds of sale." Wolcott v. Commercial Investment Trust, 7 F.Supp. 809, 811 (S.D.N.Y. 1934). Accordingly, we hold that under the circumstances as they now exist the best evidence of value is the proceeds from the sales to American Paper and Channel Master Corporation.

■ The Referee allowed recovery against F.D.I.C. for the amount of $238,-000, the purchase price to American Paper as opposed to the proceeds of the sale. As noted, after receipt of some money under the contract, the purchaser defaulted. We believe this conclusion was incorrect for two reasons. First, the fact that the agreement was competent evidence of value does not make a paper purchase price of $238,700 in cash. "A credit sale is indicative of the fair market value of the property only to the extent to which the notes can be turned

into cash, that is, are 'equivalent to cash.'" Riley v. District of Columbia Redevelopment Land Agency, 100 U.S. App.D.C. 360, 246 F.2d 641, 643–644 (1957). Second, since the transaction was not consummated and this amount never realized, absent any wrongdoing and in view of the subsequent sale, F.D.I.C. should not be held liable for the remainder of the purchase price. F.D.I.C. was not an insurer. In justifying this result the trustee cites Perkins v. Remillard, 84 F.Supp. 224, 227 (D.Mass.1949) wherein the Court said:

> The preferee would be accountable to the trustee * * * for the fair value of the property he had destroyed. Or, if there had been a sale, the preferee would be accountable not only for the actual proceeds of the sale, but for such additional sum as a fair sale would have netted. * * * (citations omitted)

These charges will not lie, for the record before us is barren of any evidence of destruction of property or unfairness of sale.

■ The order of November 6, 1964 awarded the trustee interest on the proceeds of the notes from July 31, 1957. In MacIntyre v. State Bank of Albany, 307 N.Y. 630, 633, 120 N.E.2d 832 (1954) the Court held that recovery of interest under Section 15 "is allowable only from the date of demand, if there is a demand, otherwise from commencement of suit * * *." See also Bicayne-Gallowhur Corp. v. Smith, 14 N.Y.2d 629, 249 N.Y.S. 2d 177, 198 N.E.2d 369 (1964). Accordingly, the order shall be so modified.

■ F.D.I.C. did not receive any credit for the appraisal fee and for legal fees in connection with the acquisition of the mortgages and the foreclosure proceedings. See F.D.I.C. Memorandum of Law, p. 68. Since the lien and the subsequent sale are valid, the Referee should have the opportunity to reconsider whether these credits are substantiated, and if so, whether they are reasonable. See also Wolcott v. Commercial Investment Trust, supra 7 F.Supp. at 812.

## F.D.I.C. APPEARS AS RECEIVER

### A. The preference is recoverable against F.D.I.C. as Receiver

 F.D.I.C. as Receiver of the Bank objects to the fact that "the decretal paragraphs of the Referee's order do not make clear that the order applies to F.D.I.C. in its capacity as Receiver and not in its corporate capacity." Memorandum of Law, pp. 71–74. Its objection is motivated by the possibility that liability in an amount in excess of what it received might require it to pay funds in its corporate capacity. Even though this is not to be the case, F.D.I.C.'s argument has merit. Although the trustee thinks it too highly technical to consider that F.D.I.C. acts in a "dual capacity," Memorandum of Law, pp. 96–97, nevertheless, as contemplated by statute, F.D.I.C. does in fact function in different capacities. See Freeling v. Sebring, 296 F.2d 244 (10 Cir. 1961). And generally suits against a receiver "are in effect only against the receivership; he being regarded as in the nature of a corporation sole. Such suits are against the funds in his hands." Smith v. Jones Lumber & Mercantile Co., 200 F. 647, 650 (W.D. Wis.1912). The trustee is entitled to priority for these preferences, see Bereth v. Sparks, 51 F.2d 441, 80 A.L.R. 909 (7 Cir. 1931), and no reason appears why they cannot be paid pursuant to the order of the Referee against F.D.I.C. as Receiver of the Bank.

### B. Federal Tort Claims Act.

F.D.I.C. maintains that the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, eliminating the theretofore sovereign immunity of certain government agencies and providing for certain procedures in the instigation of tort claims, bars the trustee's counterclaim. Its position is that while the District Court would be the proper forum, the United States, not F.D.I.C., is the proper party defendant. What this amounts to is that to the extent the trustee seeks to have affirmative judgment against the Receiver for the proceeds of the notes, the receivership estate should have been represented by the United States and the United States Attorney instead of its local attorneys, and failing that, this relief is prevented. Of course, with respect to that part of the Referee's order merely denying the Receiver's claim against the bankrupt unless it turned over the proceeds, F.D.I.C.'s argument in no wise forestalls this result for it does not deny, nor could it, that it is the proper party (acting through its local attorneys) to bring the claim against Anjopa's estate.

 There are several reasons why the trustee should not be prevented from recovering the proceeds. To begin with, the trustee's counterclaim is brought against the receivership estate and not against F.D.I.C. in its agency or corporate capacity. Second, the Court's jurisdiction here is predicated on 28 U.S.C. § 1334 relating to bankruptcy matters and proceedings. Compare Freeling v. F. D. I. C., 221 F.Supp. 955 (W.D.Okla.1962), aff'd per curiam 326 F.2d 971 (10 Cir. 1963). The Bankruptcy Court is a court of equity. In re Gibraltor Amusements Ltd., 315 F.2d 210, 216 (2d Cir. 1963), and its jurisdiction is exclusive. It has "equitable power * * * to grant complete relief between the parties before the court * * *." Commercial Discount Co. v. Rutledge, 297 F.2d 370, 373 (10 Cir. 1961). In addition, F.D.I.C. first raised this argument when the findings of fact and law were submitted. It would be inequitable to permit the Receiver to escape liability by raising this plea at this late hour, having already allowed the trustee to proceed at his peril.

Third, and finally, there has been neither a "tort" committed within the meaning of 28 U.S.C. § 1346(b), nor damage caused by the regulation of the monetary system under 28 U.S.C. § 2680(i). This is a proceeding under Section 70(e) of the Bankruptcy Act; F.D.I.C. must only turn over what is not its right. In a

similar context, but with respect to corporate directors, the Court. in Duell v. Brewer, 92 F.2d 59, 60, 112 A.L.R. 1246 (2d Cir. 1937) said:

The directors were the active persons in procuring all the transfers and had full knowledge of the bankrupt's insolvency; and if taking a preference were a tort, they would be liable, just as the directors of a company are liable for any other torts which they procure it to commit. But preference is the creature of statute, whether under the Bankruptcy Act or the New York Stock Corporation Law; and the only resulting liabilities are those which the statutes declare.

The statute would treat the transferee-Receiver as a "constructive trustee." Id. at 61.

## CONCLUSION

For the reasons stated herein we have found that: (1) F.D.I.C. as Receiver had a valid equitable lien.on Anjopa's property to the extent of the traced funds; (2) the receipt of the notes and the proceeds thereunder violated Section 15 of the New York Stock Corporation Law; (3) the Receiver was subject to the New York Statute; (4) the trustee, because of the government's tax claims, had standing to attack these transactions; (5) the trustee is entitled to judgment against F.D.I.C. as Receiver for the proceeds of the notes and the uncollected notes payable and interest thereon from the date of the trustee's petition (6) F.D.I.C.'s unsecured claim should be reduced by the amounts it received on its mortgages and increased by the allowable credits; and (7) the Federal Tort Claims Act does not bar the above relief.

Accordingly, the order of November 6, 1964 is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

This shall be considered an order; settlement thereof is unnecessary.